REVISED, JANUARY 5, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30498
_____


EVERGREEN PRESBYTERIAN MINISTRIES INC; HEALTH SERVICE
DISTRICT 1 POINTE COUPEE, doing business as Pointe Coupee
General Hospital; HOSPITAL SERVICE DISTRICT NO 1 AVOYELLES
PARISH, doing business as Bunkie General Hospital; FARLEY
WAYNE LUTTRELL; ROBERT FORD; ET AL; IBERIA COMPREHENSIVE
COMMUNITY HEALTH CENTER INC; NEW ORLEANS PRIMARY HEALTH CARE
HEALTH DEPARTMENT/HEALTH CARE FOR THE HOMELESS INC; DESOTO
COMPREHENSIVE HEALTH CENTER INC; ST HELENA COMMUNITY HEALTH
CENTER INC; DAVID RAINES COMMUNITY HEALTH CENTER INC; BAYOU
COMPREHENSIVE HEALTH FOUNDATION INC; CATAHOULA PARISH
HOSPITAL DISTRICT NO 2 INC; CAPITOL CITY FAMILY HEALTH
CENTER INC; SOUTHWEST LOUISIANA PRIMARY HEALTH CARE CENTER
INC; DELTA RURAL HEALTH SERVICES INC; LEESVILLE RURAL HEALTH
SERVICES INC; NATCHITOCHES OUTPATIENT MEDICAL CENTER INC; ST
GABRIEL HEALTH CLINIC INC; TECHE ACTION BOARD INC, doing business
as Tech Action Clinic; EXCEL INC

                                    Plaintiffs - Appellees

          v.

DAVID W HOOD, Secretary Louisiana Department of Health &
Hospitals

                                    Defendant - Appellant

-------------------------------------------------------
LOUISIANA NURSING HOME ASSOCIATION; I H S LULING; I H S
SHREVEPORT; I H S GONZALES; I H S LAFAYETTE; ET AL

                                    Plaintiffs - Appellees

          v.

DAVID W HOOD, Individually and in his official capacity
as Secretary of the Department of Health & Hospitals
for the State of Louisiana

                                    Defendant - Appellant

------------------------------------------------------
CALCASIEU ASSOCIATION OF RETARDED CITIZENS INC; EVANGELINE
ASSOCIATION OF RETARDED CITIZENS INC; SOUTHERN COMFORT
COMMUNITY HOMES; PREFERRED LIVING INC; IBERIA ASSOCIATION OF
RETARDED CITIZENS INC; MULTI CARE INC; IBERIA COMPREHENSIVE
COMMUNITY HEALTH CENTER INC; NEW ORLEANS PRIMARY HEALTH CARE
HEALTH DEPARTMENT/HEALTH CARE FOR THE HOMELESS INC; DESOTO
COMPREHENSIVE HEALTH CENTER INC; ST HELENA COMMUNITY HEALTH
CENTER INC; DAVID RAINES COMMUNITY HEALTH CENTER INC; BAYOU
COMPREHENSIVE HEALTH FOUNDATION INC; CATAHOULA PARISH
HOSPITAL DISTRICT NO 2 INC; CAPITOL CITY FAMILY HEALTH
CENTER INC; SOUTHWEST LOUISIANA PRIMARY HEALTH CARE CENTER
INC; DELTA RURAL HEALTH SERVICES INC; LEESVILLE RURAL HEALTH
SERVICES INC; NATCHITOCHES OUTPATIENT MEDICAL CENTER INC; ST
GABRIEL HEALTH CLINIC INC; TECHE ACTION BOARD INC, doing
business as Tech Action Clinic; EXCEL INC

                                    Plaintiffs - Appellees

     v.

DAVID W HOOD, Secretary of Louisiana Department of Health
& Hospitals

                                    Defendant - Appellant

------------------------------------------------------
DOCTORS HOSPITAL OF OPELOUSAS LIMITED PARTNERSHIP, doing
business as Doctors Hospital of Opelousas; UNIVERSITY
REHABILITATION HOSPITAL INC, doing business as Physicians
Hospital of New Orleans; DIXON MEDICAL CENTER INC; WEST
CARROLL HOSPITAL INC; HOSPITAL SERVICE DISTRICT MOREHOUSE
PARISH, doing business as Morehouse General Hospital; ET AL

                                    Plaintiffs - Appellees

     v.

DAVID W HOOD, Secretary of the Louisiana Department of
Health & Hospitals

                                    Defendant - Appellant

_____

           Appeal from the United States District Court

                            2

_____

December 11, 2000

Before KING, Chief Judge, and REYNALDO G. GARZA and PARKER, Circuit Judges.

KING, Chief Judge:

Defendant-Appellant David W. Hood, Secretary of the Louisiana Department of Health and Hospitals, appeals from the district court's grant of a preliminary injunction in favor of Plaintiffs-Appellees Evergreen Presbyterian Ministries, Inc., et al. For the following reasons, we VACATE the preliminary injunction and REMAND to the district court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Secretary of the Louisiana Department of Health and Hospitals is before this court seeking relief from the district court's preliminary injunction. Due to a budgetary shortfall in Louisiana's Medicaid program and an Executive Order by Louisiana's Governor to achieve a savings in the state's general fund, the Louisiana Department of Health and Hospitals ("LDHH") proposed a seven-percent (7%) across-the-board reduction of Medicaid reimbursement rates paid to private health care providers and certain targeted cuts[1] in Louisiana's Medicaid

_____

[1] Certain pleadings challenge the "payment reductions" without distinguishing between the 7% reimbursement rate reduction and the targeted cuts. However, because no evidence or arguments were offered on the targeted cuts, and because the

3

program.  This proposal precipitated a series of suits against the Secretary of LDHH, brought by intermediate care facilities for the mentally retarded, rural hospitals, nursing homes, home health agencies, community homes, hospitals, and Medicaid recipients, in which the plaintiffs are seeking to prevent the reimbursement rate reduction from becoming effective.

The focus of these lawsuits is two sections of the Social Security Act, 42 U.S.C. §§ 1396a(a)(13)(A) and 1396a(a)(30)(A), which the plaintiffs claim were violated when LDHH attempted to implement the reimbursement rate reduction.  In order for us to provide the proper background for the resolution of these issues, we must first undertake a review of the Medicaid program as it exists in Louisiana.

## A. The Medicaid Program

In the Social Security Amendments of 1965, Congress established Title XIX, commonly referred to as the "Medicaid Act."  See Pub. L. No. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1396-1396u).  The Medicaid Act established a program that supplies federal funds to states that agree to maintain a medical assistance program for the benefit of aged, blind, or permanently disabled individuals and for the benefit of families with dependent children.  See 42 U.S.C.

district court focused on the 7% rate reduction, our sole concern in this opinion is with the rate reduction.

4

§ 1396 (1992).  The Medicaid program is a cooperative program that is financed jointly by the federal and state governments.  See 42 C.F.R. § 430.0 (1999).  Once a state enters the program, it is charged with the program's administration within its borders.  See id.

The program is voluntary; however, once a state chooses to join, it must follow the requirements set forth in the Medicaid Act and in its implementing regulations.  See Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990).  One of these requirements is that in order for a state to qualify for federal funding, also known as federal financial participation ("FFP"), it must submit a state plan[2] to the Health Care Financing Administration ("HCFA") for approval.[3]  See 42 C.F.R. § 430.10.

---

[2]  A state plan is a "comprehensive written statement" submitted by the state describing the nature and scope of the state's Medicaid program.  See 42 C.F.R. § 430.10.  The state plan "contains all information necessary for [the Health Care Financing Administration] to determine whether the plan can be approved to serve as a basis for Federal Financial Participation (FFP) in the State program."  Id.  The Medicaid Act sets out a laundry list of sixty-five items that must be contained within a valid state plan.  See 42 U.S.C. § 1396a(a) (2000).  Two of these items, the "public process provision" and the "equal access provision," see id. §§ 1396a(a)(13)(A), (a)(30)(A), are the primary focus of this case and will be explained in greater detail infra.

[3]  HCFA, an arm of the Department of Health and Human Services ("DHHS"), has been delegated the authority by the Secretary of DHHS to administer the Medicaid program at the federal level and to implement the underlying regulations.  See 42 U.S.C. § 1302; 49 FED. REG. 35,247, 35,249 (1984).

5

The state of Louisiana has chosen to participate in the Medicaid program.  Under the joint federal-state funding arrangement for Louisiana's Medicaid program, Louisiana is required to pay, or "front," thirty percent of the funds necessary to reimburse Medicaid providers.  The remaining seventy percent is provided by the federal government.  In implementing the state program, Louisiana designated LDHH to administer the plan within the state.  David Hood, the Defendant-Appellant, is the Secretary of LDHH.

As the Secretary of LDHH, Hood is charged with the responsibility of submitting the state plan and any amendments to HCFA.  See 42 C.F.R. § 430.12.  An amendment must be submitted to HCFA whenever there is a "[m]aterial change[] in State law, organization, or policy, or in the State's operation of the Medicaid program."  Id. § 430.12(c).  A proposed amendment to Louisiana's state plan is the subject of this suit.

## B. The Amendment

In November 1999, Hood was informed of a $153 million projected budget deficit within LDHH's Medicaid program for the 1999-2000 fiscal year.  On December 3, 1999, Hood reported this projected shortfall to the state's Joint Legislative Committee on the Budget.  On December 7, this impending budgetary shortfall was compounded by an Executive Order from Louisiana's Governor

6

directing all executive branches of the state government to achieve a savings of approximately $50 million in the state's general fund.[4]

Hood responded first to the Executive Order by devising an "Executive Order Reduction," which was designed to produce various savings within LDHH while attempting to minimize the impact on private providers.  However, to respond to the $153 million shortfall[5] within the Medicaid program, LDHH proposed, along with the targeted cuts, a 7% across-the-board reduction of the reimbursements to private providers of services to Medicaid recipients.

To implement the 7% reimbursement reduction, Hood and Charles Castille, LDHH's Undersecretary, devised a Spending Reduction Plan, the contents of which make up the proposed amendment to Louisiana's state plan.  The Spending Reduction

---

[4]  Specifically, the Executive Order required Hood to reduce LDHH's budget requirements by roughly $22.5 million.  Of that $22.5 million, approximately $16 million was to be withheld from LDHH's Medicaid program.

[5]  Deposition testimony from Charles Castille, the Undersecretary for LDHH, shows that at some time during the implementation of the reimbursement reduction, the projected budget deficit was reduced to approximately $126 million.  Once the reductions were applied to the shortfall, a $67 million deficit remained.  LDHH proposed covering the remaining shortfall by eliminating the optional component of LDHH's pharmacy program.  Considering this cut to be "devastating," LDHH and the Joint Legislative Committee on the Budget used roughly $20 million of the state's general funds, which, combined with federal funds, bridged the remaining budget gap.

7

Plan, if implemented, would reduce funding for the Medicaid

program in Louisiana by a total of $180 million.[6]

On January 24, 2000, Hood presented the Spending Reduction

Plan in a memorandum to the Joint Legislative Committee on the

Budget.  Hood decided that the proposed plan would be implemented

by an assortment of emergency rules pursuant to the procedures in

the then-approved state plan.[7]  On January 25, to inform the

---

[6]    This total includes FFP and comprises approximately five
percent of the entire Louisiana Medicaid budget, which was then
$3.365 billion.

[7]    The procedures contained in the state plan were a
product of section 4711 of the Balanced Budget Act of 1997, in
which Congress repealed the so-called "Boren Amendment" to the
Medicaid Act and replaced it with the current section 13(A).  See
Pub. L. No. 105-33, § 4711, 111 Stat. 251, 507-08 (1997); see
also Wilder v. Va. Hosp. Ass'n, 496 U.S. 498 (1990).  As a
result, on December 10, 1997, HCFA informed LDHH (and all state
Medicaid directors) by letter that it must amend its state plan
to comply with the new "public process" procedures of section
13(A) and included a list of public process options.  In response
to this letter, LDHH submitted a state plan amendment on December
29, 1997, which HCFA approved on February 5, 1998.
    Although it had already approved the amendment to the state
plan, on April 9, 1998, HCFA further requested by letter that all
state agencies describe the specific public process procedures
that each state chose to implement.  LDHH responded to this
letter on June 26, 1998, and informed HCFA that it used three
methods to conform to the public process requirements: the
Louisiana Administrative Procedures Act (APA), the legislative
appropriations process, and a modified emergency rule process.
More specifically, LDHH informed HCFA that the Louisiana APA
constituted part of the public process procedures that it would
follow in implementing a state plan or amendment.  Furthermore,
in the case of an emergency rule, LDHH would use a "modified
emergency rule process," which is codified at LA. REV. STAT. ANN.
§ 49:953(B) (West 2000), and allows for a comment period of
thirty days.
    Section 49:953(B) provides in relevant part:

    (1) If an agency finds that an imminent peril to the

public about the proposed amendment to the state plan, Hood began publishing a series of public notices in eight newspapers circulated within Louisiana. Separate notices were published for each category of provider, including private nursing facilities, long-term hospitals, and intermediate care facilities for the mentally retarded ("ICF/MRs"). In addition to other information, the notices indicated that LDHH was making a 7% reduction in private provider reimbursement rates due to the budgetary shortfall. The emergency rules implementing the reductions were published in the February 20, 2000 edition of the Louisiana Register. The effective date for the cuts in certain optional

---

> public health, safety, or welfare requires adoption of a rule upon shorter notice than that provided in Subsection A of this Section [governing "regular" rule making procedures] and within five days of adoption states in writing to the governor of the state of Louisiana, the attorney general of Louisiana, the speaker of the House of Representatives, the president of the Senate, and the Department of the State Register, its reasons for that finding, it may proceed without prior notice or hearing or upon any abbreviated notice and hearing that it finds practicable, to adopt an emergency rule. The provisions of this Paragraph also shall apply to the extent necessary to avoid sanctions or penalties from the United States, or to avoid a budget deficit in the case of medical assistance programs or to secure new or enhanced federal funding in medical assistance programs. The agency statement of its reason for finding it necessary to adopt an emergency rule shall include specific reasons why the failure to adopt the rule on an emergency basis would result in imminent peril to the public health, safety, or welfare, or specific reasons why the emergency rule meets other criteria provided in this Paragraph for adoption of an emergency rule.

LA. REV. STAT. ANN. § 49:953(B)(1).

programs was February 1, and the effective date for the across-the-board reduction was March 1, over thirty days after the publication of the notices in the newspapers.

In response to the proposed amendment to the state plan, the plaintiffs brought suit to enjoin Hood from implementing the 7% reimbursement rate reduction and to have the proposed state plan amendment declared invalid.[8]

## C. The Preliminary Injunction[9]

---

[8] The plaintiffs have alleged various violations of the Medicaid Act and federal and state constitutions. However, because our review is limited to whether the district court abused its discretion and because the district court focused solely on two particular sections of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(13)(A) and 1396a(a)(30)(A), our inquiry begins and ends with these sections.

[9] We note that during the time of these proceedings in the district court and on appeal, an administrative process has been progressing, which is independent of these judicial proceedings. Hood filed LDHH's proposed amendment with HCFA on March 27, 2000.

In March 2000, the district court granted temporary restraining orders in favor of the plaintiffs, enjoining Hood from implementing the proposed reimbursement rate cuts. On May 4, the district court granted the plaintiffs' motion for a preliminary injunction. The next day, this court granted Hood's motion for a stay pending appeal and, on May 12, clarified that our May 5 order applied to all restraining orders and injunctions issued by the district court.[10]

_____

Normally, HCFA has ninety days to approve or disapprove the proposed amendment, see 42 C.F.R. § 430.16(a)(1); however, as authorized under the regulations, HCFA mailed to LDHH several "stop-the-clock" letters. A stop-the-clock letter is a request by HCFA for additional information, which tolls the ninety-day deadline by which HCFA must approve the amendment. See 42 C.F.R. § 430.16(a)(2). Once HCFA receives the requested information, the ninety-day approval period begins anew. See id. Supplemental filings with this court reflect that the status as of September 2000 was that HCFA had tolled the ninety-day period by advising Hood that additional information is necessary and the requested information had not yet been furnished. Should HCFA ultimately disapprove the amendment, however, LDHH would be considered in noncompliance, and FFP would be at risk. See id. § 430.35.

[10] The plaintiffs have asserted that when the district court entered the preliminary injunction on May 4, 2000, the temporary restraining orders previously entered became moot. The plaintiffs also argue that the preliminary injunction is not properly before this court because Hood did not timely appeal its issuance. For these reasons, the plaintiffs contend that the appeal should be dismissed because without the temporary restraining orders, there is nothing to appeal.

We find, however, that Hood timely appealed the issuance of the preliminary injunction and that the preliminary injunction is part of this appeal. As this court clarified on May 12, our May 5 order granting Hood's motion to stay the preliminary injunction and his motion to expedite the appeal applied "to all restraining orders and injunctions granted by the District Court in this case through the date of our said order." Because we conclude the preliminary injunction is part of this appeal, the question of

11

## II. STANDARD OF REVIEW

A preliminary injunction is considered "an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." White v. Carlucci, 862 F.2d 1209, 1211 (5th Cir. 1989) (internal quotations omitted) (quoting Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir. 1985)); see also Harris County, Tex. v. CarMax Auto Superstores, Inc., 177 F.3d 306, 312 (5th Cir. 1999). In order for a district court to grant a preliminary injunction, four requirements must be met:

> First, the movant must establish a substantial likelihood of success on the merits. Second, there must be a substantial threat of irreparable injury if the injunction is not granted. Third, the threatened injury to the plaintiff must outweigh the threatened injury to the defendant. Fourth, the granting of the preliminary injunction must not disserve the public interest.

CarMax Auto Superstores, 177 F.3d at 312 (internal quotations omitted) (quoting Cherokee Pump & Equip., Inc. v. Aurora Pump, 38 F.3d 246, 249 (5th Cir. 1994)). "The ultimate issue . . . is whether the district court abused its discretion in granting the preliminary injunction." Id. Additionally, questions of statutory interpretation are reviewed de novo. See Lara v. Cinemark USA, Inc., 207 F.3d 783, 786 (5th Cir. 2000); Whitehead v. Food Max, Inc., 163 F.3d 265, 279 (5th Cir. 1998).

---

the appealibility of the temporary restraining orders is essentially moot as they are subsumed in the district court's preliminary injunction.

**III. THE PROPRIETY OF THE PRELIMINARY INJUNCTION**

The district court granted the plaintiffs' requested preliminary injunction, finding that they had satisfied their burden on each of the four preliminary injunction factors. The district court focused its analysis on two sections of the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A) ("section 13(A)") and 42 U.S.C. § 1396a(a)(30)(A) ("section 30(A)"), and concluded that the plaintiffs provided sufficient evidence to "support a substantial likelihood of a violation" of each section. Evergreen Presbyterian Ministries, Inc. v. Hood, 116 F. Supp. 2d 745, 751, 754 (W.D. La. 2000). We address these sections in turn to determine whether the plaintiffs did in fact prove they had a substantial likelihood of success on the merits.[11]

**A. Substantial Likelihood of Success on the Merits Under Section 13(A)**

1. Availability of a Right of Action Under § 1983 to Redress Violations of Section 13(A)

---

[11] Because we find that the plaintiffs failed in their burden of proving a substantial likelihood of success on the merits, we need not address the remaining preliminary injunction factors.

13

In order to find that the plaintiffs have a substantial likelihood of success in proving violations of section 13(A), the plaintiffs must first demonstrate that they have a right of action under 42 U.S.C. § 1983. The district court found that the plaintiffs do have such a right of action under § 1983 to enforce procedural violations of section 13(A).

On appeal, Hood makes no argument in his briefs to this court regarding whether a right of action exists under § 1983 to enforce the procedural requirements of this section; he argues only that the plaintiffs are precluded from challenging the reasonableness of the resulting reimbursement rates through section 13(A), a contention that the plaintiffs do not challenge. Therefore, Hood has abandoned any argument regarding whether a right of action exists under § 1983 to enforce the public process procedures of section 13(A). See Johnson v. Sawyer, 120 F.3d 1307, 1315-16 (5th Cir. 1997) ("We have held repeatedly that we will not consider issues not briefed by the parties."); McKethan v. Tex. Farm Bureau, 996 F.2d 734, 739 n.9 (5th Cir. 1993) (failure to sufficiently brief issue constitutes waiver of that issue). Accordingly, we assume without deciding that the plaintiffs have a right of action to enforce a violation of section 13(A) under § 1983, and we turn to the merits.

2. Hood's Compliance with the Requirements of Section 13(A)

14

In order to satisfy their burden for a preliminary injunction, the plaintiffs must show that they have a substantial likelihood of success in demonstrating that Hood did not comply with the mandates of section 13(A).  See Doe v. Duncanville Indep. Sch. Dist., 994 F.2d 160, 163 (5th Cir. 1993) ("To obtain a preliminary injunction, a movant has the burden of proving . . . a substantial likelihood of success on the merits[.]"). Section 13(A) provides in relevant part:

> A State plan for medical assistance must . . . provide
> . . . for a public process for determination of rates
> of payment under the plan for hospital services,
> nursing facility services, and services of intermediate
> care facilities for the mentally retarded under which —
> (i)   proposed rates, the methodologies underlying the
>       establishment of such rates, and justifications for the
>       proposed rates are published,
> (ii)  providers, beneficiaries and their representatives, and
>       other concerned State residents are given a reasonable
>       opportunity for review and comment on the proposed
>       rates, methodologies, and justifications,
> (iii) final rates, the methodologies underlying the
>       establishment of such rates, and justifications
>       for such final rates are published, and
> (iv)  in the case of hospitals, such rates take into
>       account (in a manner consistent with section 1923)
>       the situation of hospitals which serve a
>       disproportionate number of low-income patients
>       with special needs[.]

42 U.S.C. § 1396a(a)(13)(A) (2000).  In essence, section 13(A) provides a public process mechanism with which the state must comply before it can modify reimbursement rates to institutional providers.[12]

---

[12]   The present section 13(A) is the product of a 1997 amendment to the Medicaid Act, which repealed the Boren Amendment.  See Pub. L. No. 105-33, § 4711, 11 Stat. 251, 507-08

(1997).  The Boren Amendment provided in relevant part:

> A State plan for medical assistance must . . . provide
> . . . for payment . . . of the hospital services,
> nursing facility services, and services in an
> intermediate care facility for the mentally retarded
> . . . through the use of rates . . . which the State
> finds, and makes assurances satisfactory to the
> Secretary, are reasonable and adequate to meet the
> costs which must be incurred by efficiently and
> economically operated facilities . . . to assure that
> individuals eligible for medical assistance have
> reasonable access . . . to inpatient hospital services
> of adequate quality[.]

42 U.S.C. § 1396a(a)(13)(A) (1992).

One of the primary purposes for passing the Boren Amendment was to provide states with flexibility in setting reimbursement rates and thereby reduce Medicaid costs.  See Wilder, 496 U.S. at 505-06.  However, because of the litigation that was generated after the Boren Amendment's enactment, Congress recognized that the Amendment had the opposite effect on Medicaid costs than it had intended.  See 141 CONG. REC. S18693 (1995) (statement of Sen. Roth) ("The Boren amendment . . . has been used to actually bid the price of nursing home care up higher.").  Accordingly, with the continued rise in Medicaid costs, Congress repealed the Boren Amendment in the Balanced Budget Act of 1997.  See H.R. REP. NO. 105-149, at 1230 (1997).  According to the legislative history, Congress's intent in repealing the Boren Amendment was "to provide States with greater flexibility in setting provider reimbursement rates under the Medicaid Program."  143 CONG. REC. S4000 (1997) (statement of Sen. Hutchison).

Congress replaced the Boren Amendment with the more limited requirement that states provide for a public notice-and-comment process in their reimbursement ratemaking decisions.  See 42 U.S.C. § 1396a(a)(13)(A) (2000).  Again according to the legislative history, Congress intended to free the states from federal regulation and increased rates and to eliminate a basis for causes of action by providers to challenge reimbursement rates.  See H.R. REP. NO. 105-149, at 1230 (1997) ("A number of Federal courts have ruled that State systems failed to meet the test of 'reasonableness' and some States have had to increase payments to these providers as a result of these judicial interpretations."); see also id. ("It is the Committee's intention that, following the enactment of [the Balanced Budget Act of 1997], neither this nor any other provision of [§ 1396a] will be interpreted as establishing a cause of action for

16

### a.    The Notice Requirements

The district court observed that section 13(A) required Hood to publish "the proposed and final rates, along with the methodologies underlying such and the justification for such." Evergreen, 116 F. Supp. 2d at 753.  The district court concluded that the notices placed in the newspapers did not satisfy these requirements.  In support of this conclusion, the district court relied on deposition testimony to the effect that the newspaper notices, as interpreted by the court, did not contain the proposed rates required by section 13(A).

On appeal, Hood argues that the notices did comply with the requirements of section 13(A).  Specifically, Hood contends that LDHH placed notices in eight Louisiana newspapers with the largest statewide circulations.  Hood maintains that these notices announced: (1) the 7% reimbursement rate reduction, (2) the location of the existing methodology in the Louisiana Register,[13] and (3) the justification of avoiding a budget deficit in Louisiana's medical assistance program.  Hood argues

---

hospitals and nursing facilities relative to the adequacy of the rates they receive.").

[13]    The Louisiana Register contains the published reimbursement framework or methodology, consisting of rules and formulas, for each category of provider.  The newspaper notices referenced this methodology, citing to the specific volume and number of the Louisiana Register, for each provider category that was affected by the reimbursement rate reduction.

that the plaintiffs' sole argument is that because Hood published the proposed rate as a percentage and not as a dollar figure, he violated the mandates of the section. Hood contends that such an argument "flies in the face" of the section's goal of "maximum possible flexibility" and that the "7%" language was "best calculated to inform interested persons of what action [LDHH] intended to take."

The plaintiffs respond by arguing that they provided "ample evidence" demonstrating that Hood violated section 13(A). First, the plaintiffs point to the deposition of Sandra Victor, Chief of the Policy Development and Implementation Section in the Bureau of Health Services Financing, in which she stated that the notices did not contain the proposed rates. The plaintiffs also refer to Castille's deposition, in which he testified that the notices did not contain the proposed rates or the methodology behind those rates.

The plaintiffs also argue that the methodology referenced in the notices was that of the state's approved methodology adopted June 20, 1994, and not the methodology underlying the proposed rates. Because the 2000 reimbursement rate reduction was made without regard to a new methodology, the plaintiffs argue that the state failed to comply with section 13(A)'s requirement that the methodology underlying the proposed rates be published. The plaintiffs find support for this assertion in the deposition testimony of Jerry Barnard, a Rate Determination Specialist for

LDHH. Barnard testified that the 7% reduction was independent of the state's approved methodology[14] and did not "fit into that methodology at all."

With this information, the district court determined that "it is virtually impossible to conclude at this time that a reasonable opportunity for review or comment on the new rates was given to the interested parties." Evergreen, 116 F. Supp. 2d at 753. We disagree.

As quoted above, section 13(A) requires a state, when proposing an amendment to its state plan, to publish (1) the proposed rates, (2) the methodology behind those rates, and (3) the justification for such, in order to afford "providers, beneficiaries and their representatives, and other concerned State residents" a "reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications." 42 U.S.C. § 1396a(a)(13)(A). We conclude that Hood's notices "outlined the substance of the plan in sufficient detail to allow interested parties to decide how and whether to seek more information on the plan's particular aspects." Miss. Hosp. Ass'n v. Heckler, 701 F.2d 511, 520 (5th Cir. 1983) (discussing the public process procedures of 42 C.F.R. § 447.205).

Addressing the rate, methodology, and justification requirements of section 13(A) in order, we find that the 7%

_____

[14] See supra note 13.

19

reduction language was sufficient to satisfy the first requirement of providing interested persons with a "reasonable opportunity to review" the proposed rates. As Castille stated in his deposition, indicating the new rate by a percentage was intended "to be the most understandable way in as plain English as possible [to demonstrate] what the impact of the changes would be." We agree with Hood that the use of a percentage, rather than a dollar figure, in the notice was an acceptable way to inform interested persons of what action LDHH intended to take. Moreover, LDHH sent rate letters to all ICF/MRs and nursing facilities, in which these providers were informed of their respective new rates.

The district court relied on the testimony of Sandra Victor in finding that the notices did not contain the required "rate" language. However, Victor's deposition testimony also revealed that the notices described the proposed change in reimbursement rates and that it would have been "unusual" to publish the proposed rates in the notices. As Castille acknowledged, LDHH could have published notices that were several pages in length in which LDHH described each provider's new rate. We conclude, however, that such a notice may not have as readily furnished recipients or providers with the proper tools to understand the impact of the rate reduction. By stating that there would be a 7% reduction, recipients and providers could understand the import of the changes, making them better equipped to comment on

the proposed change.  We find this notice of the proposed rates to be satisfactory.  See Indep. Acceptance Co. v. State of Cal., 204 F.3d 1247, 1253 (9th Cir. 2000) ("Notice provisions are designed to outline[] the substance of the plan in sufficient detail to allow interested parties to decide how and whether to seek more information on the plan's particular aspects." (internal quotations omitted) (alteration in original) (quoting Visiting Nurse Ass'n v. Bullen, 93 F.3d 997, 1010 (1st Cir. 1996)); Visiting Nurse Ass'n v. Bullen, 93 F.3d 997, 1010 (1st Cir. 1996) ("As their name suggests, . . . 'notice' provisions are neither invariably nor primarily designed to afford exhaustive disclosure[.]").

Regarding the publication of the methodology underlying the proposed rates, Hood argues that it was referenced in the notices.  The plaintiffs contend that the 7% reduction was simply an across-the-board cut that was made "without regard to the approved methodology."  The plaintiffs argue further that because there is deposition testimony demonstrating that the methodology underlying the proposed rates was "independent" of the existing methodology, the methodology underlying these particular proposed rates was not actually published.  Aside from its blanket statement that "[t]he notices in question did not provide the required information," the district court did not specifically address this issue; however, we find that the combination of the reference to the existing methodology in the published notices

21

plus the announcement that the current rates would be reduced by 7% was sufficient to provide those interested with reasonable notice of the methodology underlying the proposed rates.  See Heckler, 701 F.2d at 520; see also Indep. Acceptance Co., 204 F.3d at 1253; Bullen, 93 F.3d at 1010.

The district court also did not speak specifically to the requirement of publication of the justification for the proposed rates.  Hood argues that LDHH did supply the justification for the rate change, namely that the "action [was] being taken in order to avoid a budget deficit in the medical assistance program."  We find this justification sufficient to satisfy this specific mandate of section 13(A).

We also disagree with the district court that the notices did not provide an opportunity for review and comment.  The district court determined that because the notices did not provide the required information, it was "virtually impossible to conclude . . . that a reasonable opportunity for review or comment on the new rates was given to the interested parties." Evergreen, 116 F. Supp. 2d at 753.  From a full review of the record, however, we conclude that the plaintiffs were provided with more than adequate notice and opportunity for review and comment.  Specifically, on January 25, 2000, Hood published a series of notices in the newspapers of widest circulation.  These notices appeared more than thirty days before the effective date of the reimbursement rate reduction, which was March 1, 2000.  As

22

we have just clarified, the notices adequately satisfied the guidelines regarding their content: the notices informed the public that a 7% reduction in payment to certain private providers would occur; they referenced the methodology behind the existing rates with an indication that those rates would be reduced by 7%; and they explained that the reimbursement rate reduction was occurring due to a budget deficit. Moreover, the record reveals that, along with sending rate letters to various health care providers, Hood and Castille met with several interested provider groups, including the Rural Hospital Coalition, Louisiana Nursing Home Association, community service providers, the medical society, and the medical association. On February 10, 2000, the Medical Care Advisory Committee convened to discuss the reimbursement rate reduction, and several interested groups were in attendance.[15] Finally, the published notices invited written comment by interested parties and provided the name of a person to whom those parties could send their concerns or comments, along with that person's contact information.

Therefore, we find that the district court abused its discretion in determining that Hood failed to comply with these procedures of section 13(A). The current section 13(A) was enacted to provide states with flexibility in setting its

_____

[15] At that meeting, the Medical Care Advisory Committee adopted a motion approving the reimbursement rate reduction.

reimbursement rates.[16]  Moreover, the overall purpose of section 13(A)'s criteria is to provide interested parties notice and an opportunity for review and comment.  See Heckler, 701 F.2d at 520 (discussing the requirements of 42 C.F.R. § 447.205 and finding that "[t]he agency was not required to publish every minute detail of the plan"); accord Bullen, 93 F.3d at 1010 ("As their name suggests, . . . 'notice' provisions are . . . to alert interested parties that their substantive rights may be affected in a forthcoming public proceeding.").  We find Hood's notices satisfied this purpose and conclude that interested parties were "given a reasonable opportunity for review and comment on the

---

[16]   See supra note 12.

24

proposed rates, methodologies, and justifications."[17]  42 U.S.C.

§ 1396a(a)(13)(A)(ii).[18]

---

[17]  We recognize that HCFA sent LDHH certain stop-the-clock letters after LDHH submitted its proposed amendment to HCFA on March 27, 2000.  LDHH received these letters on June 21, 2000. The letters requested additional information and clarification on various issues.  One letter provides:

> The language [in the proposed amendment] states "private hospitals are reimbursed at ninety three percent (93%) of the per diem rates in effect as of March 7, 2000".  Is this intended to eliminate the current payment methodology and set a fixed payment rate for services or to set the payment rate at 93% of [the] payment rate as determined by the methodology set forth in the State plan?  Will rates continue to be adjusted annually for inflation and then apply the 93% calculation?  Please revise the plan language to clearly indicate how the rates will be determined.

This request suggests that there may be an ambiguity or a structural defect in the state plan amendment.  Any such problem is not before us.  A challenge under section 13(A) to the adequacy of the notice of the proposed rates and of the methodologies underlying the establishment of such rates is not an appropriate vehicle for raising substantive defects in the rates or the methodologies for establishing them.

[18]  The district court also based its holding upon the fact that "perhaps 'emergency rules' would not have been necessary had the issue of the predicted budget shortfall been addressed earlier."  _Evergreen_, 116 F. Supp. 2d at 753.  However, we find that this is not an appropriate inquiry.  As we explained in note 12, _supra_, with the repeal of the Boren Amendment in 1997 and the establishment of the present section 13(A), HCFA informed LDHH by letter that it must amend its state plan in order to provide for a public process in compliance with the new section.  The letter contained "Public Process Options" that HCFA found "acceptable" and that would still "allow[] states the flexibility to design their public process."  LDHH adopted one of those options for its state plan and employed that option during the process now in dispute.  Therefore, because Hood complied with one of the public process options approved by HCFA, which provided a thirty-day comment period, we conclude that Hood was within his authority to propose the new rates using the modified rulemaking process.

### b. The Situation of Disproportionate Share Hospitals

In addition to finding that the notices did not contain the required information to provide interested parties with notice and an opportunity for review and comment, the district court concluded that deposition testimony existed which demonstrated that Hood did not consider the situation of hospitals that serve a disproportionate number of low-income patients with special needs ("DSHs") when he formulated the reimbursement rate reduction.[19] The court points to the deposition of Tom Collins, Louisiana's Medicaid Director, in which he testified that he did not "recall considering" the needs of these hospitals.

Hood argues that the situation of DSHs was considered by LDHH and that LDHH "decided to make no reductions to the separate budget that Louisiana has for DSH hospital payments." Therefore, Hood contends that no changes were made in the amount of, or the methodology for, DSH payments.[20] The plaintiffs reply that Hood

---

[19] The final subsection of section 13(A) provides that "[i]n the case of hospitals, such rates take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv).

[20] During oral argument in this court, there was a discussion over the distinction between "rates" and "payments." Hood argued that because the uncompensated cost "payment" percentage of seventy percent remained the same, LDHH need not have been concerned about the situation of these hospitals when their "rates" were reduced by 7%. Hood's counsel revealed that while the "reimbursements" to DSHs were included in the cut, the other "payments" to DSHs were not. In the March 2, 2000 hearing on the temporary restraining order, LDHH's general counsel explained this concept:

"admitted" that in adopting the rate reduction, he failed to consider the situation of DSHs.

To ascertain whether Hood complied with the last subsection of section 13(A), we must pay special attention to the language of that subsection. Under a plain reading of section 13(A), the "rates" are required to take into account the situation of DSHs. Therefore, if the rates, as amended, take into account the situation of DSHs, then the question whether Hood himself, or LDHH, "considered" the situation of the hospitals before implementing the rate reduction need not be addressed.

DSHs receive a separate payment as a reimbursement for uncompensated costs, equal to seventy percent of those uncompensated costs. The separate DSH payment of seventy percent of uncompensated costs was not altered with the rate reduction. We conclude that because the DSH payments were not altered, the reduced rates necessarily take into account the situation of DSHs. This is because the 7% rate reduction will be considered an uncompensated cost, and therefore, DSHs would still recover seventy percent of that 7% rate reduction as a "payment" due to

---

[O]ne of the points here was made that we had not considered the disproportionate share hospitals' impact, rural hospitals. They will get 70 percent of the cuts back to them because they are — they get an in-kind match — the rural hospitals are set up in such a way in [the] statute to where they can get an in-kind return of 70 percent uncompensated costs. And this rate cut for them would be an uncompensated cost so they would get 70 percent of that back.

27

their special status.  Therefore, inasmuch as the 7% reduction qualifies as an uncompensated cost, the reduced rates would continue to account for the special situation of DSHs.  The district court's conclusion to the contrary was error.

In summary, we conclude that the district court abused its discretion in finding that, due to Hood's presumed failure to publish the proposed rates, methodology, and justifications behind the rate reduction, the plaintiffs have a substantial likelihood of success in demonstrating that Hood failed to give interested individuals "a reasonable opportunity for review and comment."  Furthermore, we conclude that the district court misinterpreted section 13(A)'s requirement that the rates take into account the situation of DSHs and, therefore, abused its discretion in finding that the plaintiffs have a substantial likelihood of success in proving a violation of section 13(A)'s final subsection.

## B. Substantial Likelihood of Success on the Merits
## Under Section 30(A)

1. <u>Availability of a Right of Action Under § 1983 to Redress Violations of Section 30(A)</u>

As with our analysis of section 13(A), to determine if the plaintiffs have a substantial likelihood of success on the

merits, we must begin by addressing whether the plaintiffs may maintain a right of action under 42 U.S.C. § 1983 to remedy violations of section 30(A). The district court concluded that both the provider plaintiffs <u>and</u> the recipient plaintiffs have a right of action under § 1983 to redress violations of section 30(A).

We agree that under the controlling test fashioned by the Supreme Court, which we will discuss <u>infra</u>, <u>recipients</u> have that right of action. However, we find that the district court erred as a matter of law in finding that <u>providers</u> also have a right to bring suit under § 1983 to remedy violations of section 30(A).

We begin our analysis by examining the test that the Supreme Court has created to guide courts in determining whether Congress intended a federal statute to provide plaintiffs with a right of action under § 1983. Next, we consider whether section 30(A), in fact, provides such a right to the individual plaintiffs in this particular suit. Finally, once we have decided which plaintiffs have a right of action under § 1983, we must evaluate whether those plaintiffs have satisfied the evidentiary burden necessary to demonstrate a substantial likelihood of success in proving violations of section 30(A).

    a.    **The <u>Wilder</u>/<u>Blessing</u> Test for Rights of Action Under § 1983 to Remedy Violations of a Federal Statute**

29

Section 1983 affords a cause of action to a plaintiff against anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; see also Blessing v. Freestone, 520 U.S. 329, 340 (1997); Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 508 (1990).  Section 1983 provides redress for violations of federal statutes, as long as the plaintiff is asserting a "violation of a federal right, not merely a violation of federal law."  Blessing, 520 U.S. at 340.

Two leading Supreme Court decisions, Wilder v. Virginia Hospital Ass'n, 496 U.S. 498 (1990), and Blessing v. Freestone, 520 U.S. 329 (1997), have recognized the "traditional" three-part test employed to determine whether a plaintiff is advancing a violation of a "federal right," and not merely one of federal law:

> First, Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

Blessing, 520 U.S. at 340-41 (citations omitted); see also Wilder, 496 U.S. at 509.  However, under this test, even if a plaintiff establishes that the federal statute at issue creates a federal right, "there is only a rebuttable presumption that the

30

right is enforceable under § 1983," Blessing, 520 U.S. at 341; Congress may have expressly or impliedly foreclosed such a remedy. See id.

Our analysis of the Wilder/Blessing test is facilitated by Wilder itself, in which the Supreme Court addressed whether a particular provision of the Medicaid Act created a "federal right" for the plaintiffs in that case. In Wilder, the Supreme Court considered whether the Boren Amendment — the precursor to the current section 13(A)[21] — was enforceable in an action brought pursuant to § 1983. See 496 U.S. at 501-02. The Boren Amendment required that payments to providers be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities[.]" 42 U.S.C. § 1396a(a)(13)(A) (1992).

The Wilder Court addressed whether health care providers could bring suit to challenge the method by which a state reimbursed those providers under the Medicaid Act. See Wilder, 496 U.S. at 501. In finding that health care providers could bring such a suit, the Court employed the three-part test set out above.

First, the Court concluded that there was "little doubt" that the providers were the intended beneficiaries of the Boren Amendment because it "establishe[d] a system for reimbursement of

---

[21] For a discussion on the Boren Amendment, see note 12 supra.

31

providers and [was] phrased in terms benefiting health care providers," in that it required a state plan to provide for their payment. Id. at 510. Next, the Court determined that the Boren Amendment imposed a "binding obligation" on the states because the provision was "cast in mandatory rather than precatory terms." Id. at 512. Persuasive to the Wilder Court in analyzing this factor was that the section was prefaced with the language that a "State plan must" provide for payment to health care providers. See id. (emphasis and internal quotations omitted). Moreover, the Court noted that receipt of FFP was "expressly conditioned on compliance with the amendment and the Secretary is authorized to withhold funds for non-compliance with this provision." Id. (citing 42 U.S.C. § 1396c and 42 C.F.R. § 430.35). Finally, the Court found that even though "the Boren Amendment [gave] a State flexibility" in adopting rates, "the obligation imposed by the amendment [was not] too 'vague and amorphous' to be judicially enforceable." Id. at 519. The Court was persuaded by the fact that the section and its implementing regulations provided factors that a state must consider in adopting rates and by the fact that the provision afforded states an "objective benchmark" of an "efficiently and economically operated facilit[y]" against which states may measure the reasonableness of their rates. See id. (alteration in original).

After establishing that the health care providers were asserting a violation of a federal right, the Court concluded its

32

analysis by finding that Congress had neither expressly nor impliedly "foreclosed enforcement of the Medicaid Act under § 1983." Id. at 520-23. Recognizing that the state had conceded that Congress had not expressly foreclosed resort to § 1983, the Court determined that the administrative scheme underlying the Medicaid Act "cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983." Id. at 522.

In their analyses regarding whether the plaintiffs may bring suit under § 1983 to remedy a violation of section 30(A), neither Hood nor the district court reference Wilder. We recognize that later cases have affected the Wilder analysis. See Suter v. Artist M., 503 U.S. 347 (1992)[22]; see also Blessing, 520 U.S. 329.[23] However, because these decisions did not overturn Wilder,

_____

[22] In Suter, the Court answered the question whether certain children who were wards of the state had the right to enforce a provision of the Adoption Assistance and Child Welfare Act of 1980 (the "Adoption Act") pursuant to a suit brought under § 1983. The Adoption Act required a state plan to contain a provision that the state make "reasonable efforts" to "eliminate the need for removal" of a child from his or her home and to reunite the child with his or her family. See Suter, 503 U.S. at 350-51. The Suter Court held that the provision did not create a cause of action for the children to enforce under § 1983 because "the 'reasonable efforts' language d[id] not unambiguously confer an enforceable right upon the Act's beneficiaries." Id. at 363 (emphasis added). Suter teaches us, then, that Congress must unambiguously confer a benefit upon a plaintiff in order for that plaintiff to enforce a federal statutory right under § 1983.

[23] In Blessing, the Court confirmed the requirement that in order for a plaintiff to state a claim under § 1983 for violation of a federal statute, Congress must unambiguously confer in that statute an "individual entitlement" upon the

33

plaintiff.  The procedural protections of Title IV-D of the Social Security Act came before the Court in Blessing, where the Court faced a challenge by five mothers in Arizona, whose children were eligible to receive child support services from the state.  See 520 U.S. at 332.  The mothers sued pursuant to Title IV-D of the Social Security Act to enforce a statutory provision requiring "substantial compliance" with Title IV-D's procedures.  See id.  The Blessing Court, overturning the Court of Appeals for the Ninth Circuit's decision, held that this provision did not create an enforceable right under § 1983.  See id. at 342.

After setting out the "traditional" test for determining whether a statutory provision creates an enforceable federal right, the Court turned to whether the plaintiffs established that Title IV-D provided them with such a right.  The Blessing Court found that the Ninth Circuit erred in broadly holding that Title IV-D created a federal right of "substantial compliance" with the Act.  See id. at 342.  The Court concluded that the plaintiffs had not pled their case with enough specificity and then went on to determine whether specific rights existed under the statute.  The Court distinguished among provisions of Title IV-D that were "designed only to guide the State in structuring its systemwide efforts at enforcing support obligations" and those that were intended to benefit the plaintiffs.  See id. at 344.  First, the Court found that

> the requirement that a State operate its child support program in "substantial compliance" with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right.  Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State's Title IV-D program.

Id. at 343 (emphasis omitted).  Accordingly, the requirement of "substantial compliance" did not "fit [the] traditional three criteria for identifying statutory rights" and, therefore, did not create an enforceable federal right under § 1983.  Id. at 344.

The Court pointed out that other similar provisions within the Act also did not "fit" the criteria because they were "designed only to guide the State in structuring its systemwide efforts at enforcing support obligations."  Id.  For example, the Court explained that Title IV-D's requirements for a data processing system did not give rise to individualized rights to computer services.  See id. at 344-45.  The Court acknowledged that such provisions did "ultimately" benefit the recipients of

34

we conclude that <u>Wilder</u> is alive and well, albeit narrowed by the commands of <u>Suter</u> and <u>Blessing</u> that Congress must unambiguously confer through section 30(A) an "individual entitlement" upon <u>each</u> of the plaintiffs in this case.  See <u>Blessing</u>, 520 U.S. at 343-45 (providing examples of statutory provisions in Title IV-D of the Social Security Act that "do not give rise to individualized rights"); <u>Suter</u>, 503 U.S. at 357 (concluding that Congress must "unambiguously confer" a right upon the particular plaintiffs in that case).  As a consequence of this conclusion, we look first to whether the statute confers a federal right on each of the plaintiffs in this case.

b.    **Section 30(A) Creates a "Federal Right" in Favor of the Recipient Plaintiffs Enforceable Under § 1983**

Section 30(A) provides in relevant part:

A State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]

---

the services, "but only indirectly," and thus did not give rise to enforceable individual rights.  See <u>id.</u>

35

42 U.S.C. § 1396a(a)(30)(A) (2000).[24]  With the <u>Wilder</u>/<u>Blessing</u> framework in mind, we now analyze whether section 30(A) conveys a federal right on the plaintiffs, distinguishing between the interests of the recipient plaintiffs and those of the provider plaintiffs.

### (1)  Intended Beneficiaries

#### (i)  The Recipient Plaintiffs

The district court found that section 30(A) protected the recipient plaintiffs and "their access to medicaid care." <u>Evergreen</u>, 116 F. Supp. 2d at 750.  Hood asserts that because the provision focuses on cost containment and furnishes goals and general guidelines for states in setting their reimbursement rates, section 30(A) was "never intended to create an individual entitlement to specific reimbursement rates or services for particular providers or beneficiaries."  The plaintiffs respond that due to "the overwhelming case law" in other circuits, which has found a right of action in favor of both recipients and providers, "the district court was certainly correct in finding that Congress intended the equal access mandate of [section] 30(A) to benefit Medicaid beneficiaries and providers."

---

[24]  Because the district court's injunction did not rest on the provision of section 30(A) relating to quality of care, we do not address the enforceability of that provision here.

36

We agree with our sister circuits which have held that recipients are the intended beneficiaries of section 30(A). See Ark. Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 526 (8th Cir. 1993) ("The equal access provision is indisputably intended to benefit the recipients by allowing them equivalent access to health care services."); accord Visiting Nurse Ass'n v. Bullen, 93 F.3d 997, 1004 n.7 (1st Cir. 1996) (acknowledging that Medicaid recipients "are intended beneficiaries under the 'equal access' requirement as it affects the availability of their medical care").

Under the rationale of Wilder, we conclude that recipients are intended beneficiaries of section 30(A) because the provision is "phrased in terms" benefitting recipients in that it directly focuses on their access to medical care. See Wilder, 496 U.S. at 510. Indeed, section 30(A) speaks clearly in terms of the recipients because "care and services are [to be] available under the [state] plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). As such, we agree with the district court that section 30(A) "protects beneficiaries and their access to medicaid care," Evergreen, 116 F. Supp. 2d at 750, and find that the recipient plaintiffs have an "individual entitlement" to the equal access guarantee of section 30(A). See Blessing, 520 U.S. at 343.

37

## (ii) The Provider Plaintiffs

The more difficult question here is whether the health care providers are also intended beneficiaries of section 30(A). The district court agreed "with those decisions which have found providers to be 'beneficiaries' under the equal access portion of the statute," Evergreen, 116 F. Supp. 2d at 750, and thus concluded that Congress intended section 30(A) to benefit the provider plaintiffs in this case.

We recognize that other circuits have answered this question affirmatively, finding that Congress intended section 30(A) to benefit health care providers. See Ark. Med. Soc'y, Inc., 6 F.3d at 526 ("The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries."); accord Bullen, 93 F.3d at 1004 (finding that "providers are appropriately considered intended beneficiaries" of section 30(A)); Methodist Hosps., Inc. v. Sullivan, 91 F.3d 1026, 1029 (7th Cir. 1996) ("We therefore follow Arkansas Medical Society and hold that providers of medical care have a private right of action, derived through § 1983, to enforce [section 30(A)]."); Moody Emergency Med. Serv., Inc. v. City of Millbrook, 967 F. Supp. 488, 494 (M.D. Ala. 1997) (finding the provider plaintiff to be an intended beneficiary of section 30(A)). However, these courts have compared section 30(A) to the Boren Amendment and have reasoned that a right of action exists in favor of health

38

care providers simply because section 30(A) speaks in terms of payment to these providers.  See Ark. Med. Soc'y, Inc., 6 F.3d at 526 (concluding that providers are intended beneficiaries of section 30(A) because it "addresses payment for 'care and services' provided by noninstitutional providers"); see also Bullen, 93 F.3d at 1004 ("As long as [the Boren Amendment and section 30(A)] evince a congressional concern for preserving financial incentives to providers[,] . . . providers are appropriately considered intended beneficiaries."); Moody Emergency Med. Serv., Inc., 967 F. Supp. at 494 (citing Bullen for the proposition that providers are intended beneficiaries of section 30(A) because the provision "evince[s] a congressional concern for preserving financial incentives to encourage health care providers to provide services to Medicaid recipients").

We think reliance on the Boren Amendment is insufficient to resolve this issue.  Blessing and Suter demand that we focus our inquiry on whether Congress intended to create an "individual entitlement" for each plaintiff.  As we illustrate below, in contrast to the Boren Amendment, section 30(A) does not create an "individual entitlement" for individual providers to a particular level of payment because it does not directly address those providers.  Instead, section 30(A) speaks directly to individual recipients, conferring upon them an "individual entitlement" to equal access to medical care.

39

The <u>Wilder</u> Court held that the Boren Amendment "establishe[d] a system for reimbursement of providers," 496 U.S. at 510, in that it was directly keyed to their financial interests by requiring "reasonable and adequate" payments to those providers.  <u>See</u> 42 U.S.C. § 1396a(a)(13)(A) (1992). Therefore, the Boren Amendment directly addressed providers. Section 30(A), as we discussed in the prior section, focuses on recipients in that it is directly keyed to the recipients' access to medical care, and as a result, the recipients are the direct intended beneficiaries of the section.

However, in contrast to the Boren Amendment, section 30(A) does <u>not</u> create an individual entitlement in favor of any provider.  The section benefits recipients by ensuring there is an adequate number of providers in the marketplace.  Therefore, it may be true that health care providers as a group are indirectly benefitted by section 30(A) because the section requires that the payments to providers be sufficient to ensure that Medicaid recipients have equal access to medical care.  But it cannot be said that section 30(A) necessarily confers upon each provider an individual right to a particular payment because the section does not focus directly on providers.

One example will suffice: Assume we have a nursing home in Baton Rouge with 150 residents, which, following the 7% reduction, is forced into bankruptcy and then liquidation. Assume further that the district court decides that the relevant

40

geographic market to measure the access of recipients is the Baton Rouge market for nursing home care and also that the district court concludes that the recipients are entitled to the same access to nursing home care in Baton Rouge as that of non-Medicaid residents.[25] Finally, assume that, once the nursing home closes, all 150 residents are able to fill vacant beds in other facilities in Baton Rouge. Under this scenario, there is no violation of the recipients' equal access rights, despite the fact that the bankrupt nursing home was put out of business.

From this example, it is apparent that while recipients have an individual entitlement to equal access to medical care, any benefit to health care providers is indirect at best. The statute does not confer any direct right upon the individual provider because, as the above example illustrates, even if an individual provider is forced to liquidate, the recipients' right to access is not necessarily violated. That the provider plaintiffs may receive an indirect benefit under section 30(A) is not sufficient to support a claim that they are its intended beneficiaries. See Blessing, 520 U.S. at 344. Accordingly, we

---

[25] This assumption is derived from the express requirements of the equal access provision and from guidance provided by the House Report accompanying the codification of the equal access portion of section 30(A). See 42 U.S.C. § 1396a(a)(30)(A); H.R. REP. No. 101-247 (1989), reprinted in 1989 U.S.C.C.A.N. 1906 ("The question which the Secretary must ask is whether Medicaid beneficiaries have access to provider services that is at least as great as that of others in the area[.]").

find that providers are not intended beneficiaries of section 30(A).[26]

We recognize that if the reimbursement rate reduction should result in the widespread demise of providers or discharge of Medicaid patients for fiscal reasons, the access of Medicaid recipients to care and services may be adversely affected, potentially to a degree that would violate section 30(A)'s command of equal access. For this reason, evidence of financial distress to providers resulting from the rate reduction is clearly relevant to the question whether the equal access right provided by section 30(A) to Medicaid recipients has been violated. For the reasons we have indicated, however, the fact that evidence of financial distress is relevant in a suit brought by Medicaid recipients does not amount to an individual entitlement on the part of any provider under the statute.

---

[26] While we recognize the statutory maxim that "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989) (internal quotations omitted) (quoting United States v. Price, 361 U.S. 304, 313 (1960)) — a maxim that has special force when the later Congress is amending a section of the statute different from the one under consideration — we note that our conclusion that providers are not intended beneficiaries of section 30(A) is consistent with Congress's concern in its repeal of the Boren Amendment to preclude further lawsuits by providers to contest the adequacy of their reimbursement rates. See H.R. REP. No. 105-149, at 1230 (1997) ("It is the Committee's intention that, following the enactment of [the Balanced Budget Act of 1997], neither this nor any other provision of [§ 1396a] will be interpreted as establishing a cause of action for hospitals and nursing facilities relative to the adequacy of the rates they receive.").

## (2)  Vague and Amorphous

Having found that only the recipient plaintiffs are intended beneficiaries of section 30(A), we turn to the second factor of the Wilder/Blessing test.[27]  We agree with the district court and the many other courts that have addressed the equal access provision that it is not too vague and amorphous to be beyond the competence of the judiciary to enforce.  However, we reach this conclusion employing a different analysis than that used by the district court.[28]

---

[27]  Because we have concluded that health care providers are not intended beneficiaries of the equal access provision, we continue our analysis focusing only on the recipient plaintiffs.

[28]  The district court and the plaintiffs incorrectly analyzed this prong of the Wilder/Blessing test.  The district court found that the equal access provision was not too vague and amorphous to enforce because the

> [p]laintiffs set forth a detailed and specific claim
> that their federal rights under . . . the equal access
> . . . section[] of the Medicaid statute were violated
> through the defendants [sic] promulgation of the
> proposed rates in an emergency rule without adequately
> assuring the rates would not affect access to medical
> care[.]

Evergreen, 116 F. Supp. 2d at 750-51.  It is apparent that the district court borrowed language from Blessing to analyze this factor, see Blessing, 520 U.S. at 342; however, such reliance is misplaced.  In the first instance, the Court never reached the vague-and-amorphous question because it found that the plaintiffs had not "identified with particularity the rights they claimed." Id.  The Court found that the plaintiffs had presented violations of Title IV-D as an "undifferentiated whole" and did not distinguish among the rights they were attempting to enforce. See id.  The Blessing Court advised that the complaint must be "broken down into manageable analytic bites" before a court can "ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal

43

Hood asserts that section 30(A) "lack[s] sufficient specificity and detail to create an enforceable right under § 1983." Additionally, Hood contends that neither the statute nor its underlying regulations provide any guidance to measure equal access. Hood acknowledges that "[a] number of earlier decisions" have found section 30(A) to be sufficiently definite for courts to enforce; however, Hood argues that these cases were decided "without the benefit of the Supreme Court's reasoning in Blessing."

The plaintiffs respond by arguing that "the equal access mandate was a regulation for 24 years and a statute now for the last 11 years." Therefore, the plaintiffs contend that "[a] body of well established case law [from] multiple circuit courts supports [the plaintiffs'] rights to enforce the equal access mandate."

We agree with those courts that have held that the equal access mandate of section 30(A) is sufficiently definite to enforce. See Bullen, 93 F.3d at 1005; Ark. Med. Soc'y, 6 F.3d at 527; Moody Emergency Med. Serv., Inc., 967 F. Supp. at 495.

First, in Wilder, the Supreme Court found that the idea of "reasonable access" to medical care was not so vague and amorphous to render the Boren Amendment unenforceable by the

_____

statute creates rights." Id. Because the Blessing Court did not engage this analysis in determining whether the plaintiffs were asserting a federal right, it is inapposite to our vague-and-amorphous analysis.

44

courts. See Wilder, 496 U.S. at 519. Here, we are evaluating recipients' "equal access" to care and services. As with the "reasonable access" requirement in the Boren Amendment, section 30(A)'s "equal access" mandate is also undefined by the statute and its implementing regulations. See id. at 507. Still, the Wilder Court found the provision sufficiently definite to enforce, see id. at 519, as we do the "equal access" language of section 30(A). Indeed, the equal access provision provides the state and courts with a much less ambiguous "measuring rod" by which to evaluate recipients' access to care. See Ark. Med. Soc'y, 6 F.3d at 527; see also Bullen, 93 F.3d at 1005 ("[T]he term 'equal access,' as employed in section [30(A)], arguably provides a more concrete standard [than 'reasonable access'], objectively measurable against the health care access afforded among the general population[.]").

Second, we understand that the phrase "geographic area" could have many definitions depending upon the type of service or the needs of recipients in a particular area. See Methodist Hosps., Inc., 91 F.3d at 1029. However, courts are familiar with the concept and are able to assess its meaning in a particular case. See id. (recognizing that courts have "wrestled with the concept of the 'geographic market' in antitrust law without producing a mechanical definition" and concluding that "[d]efining geographic markets for medical care has proven no more tractable than geographic markets in general, but courts

soldier on"). Furthermore, the Boren Amendment required states to "tak[e] into account geographic location and reasonable travel time" in determining "reasonable access," 42 U.S.C. § 1396a(a)(13)(A) (1992), and the <u>Wilder</u> Court upheld its enforceablity. <u>See</u> 496 U.S. at 519-20. We follow <u>Wilder</u> and conclude that the phrase "geographic area" is not too vague and amorphous to be beyond the competence of the judiciary to enforce.

Above all, the equal access provision affords the "objective benchmark" of access to medical care equal to that of the general population in the same geographic area. <u>Cf.</u> <u>Wilder</u>, 496 U.S. at 519; <u>see also</u> <u>Bullen</u>, 93 F.3d at 1005 (concluding that the equal access provision is "objectively measurable against the health care access afforded among the general population"); <u>Ark. Med. Soc'y</u>, 6 F.3d at 527 ("The equal access provision . . . actually gives a measuring rod for accessibility which . . . is sufficiently specific."). This finding of an "objective benchmark" was critical in <u>Wilder</u>, and we conclude that it is satisfied with respect to section 30(A).


### (3)  Binding Obligation

Finally, we agree with the district court that section 30(A) "'unambiguously impose[s] a binding obligation on the States.'" <u>Evergreen</u>, 16 F. Supp. 2d at 751 (quoting <u>Blessing</u>, 520 U.S. at 341). As was the Boren Amendment, section 30(A) "is cast in

46

mandatory rather than precatory terms," <u>Wilder</u>, 496 U.S. at 512,
in that it provides that a state plan "must" have methods and
procedures in place to assure payments are sufficient to maintain
equal access to medical care for Medicaid recipients.  Also,
under the Medicaid Act, HCFA has the authority to withhold funds
for noncompliance with section 30(A).  <u>See</u> 42 U.S.C. § 1396c; 42
C.F.R. § 430.35 (providing the bases for which HCFA may withhold
FFP); <u>see also</u> <u>Wilder</u>, 496 U.S. at 512.[29]  The Supreme Court in
<u>Wilder</u> found these factors persuasive when considering the Boren
Amendment, <u>see</u> <u>Wilder</u>, 496 U.S. at 512, as do we in our
consideration of section 30(A).

### (4)  Conclusion

We therefore find that <u>recipients</u> are intended beneficiaries
of section 30(A) because it directly addresses their access to
medical care.  However, we conclude that because section 30(A)
did not confer upon <u>providers</u> an "individual entitlement" to a
particular level of payment, the district court erred as a matter

---

[29]  As further evidence of the mandatory nature of the
provision, in 1989, Congress, concerned that the equal access
regulation was receiving inadequate enforcement, codified the
"equal access" language of section 30(A).  <u>See</u> Pub. L. No. 101-
239, § 6402, 103 Stat. 2260 (1989) (codifying 42 C.F.R.
§ 447.204, which provides that "[t]he agency's payments must be
sufficient to enlist enough providers so that services under the
plan are available to recipients at least to the extent that
those services are available to the general population").  This
codification is clear evidence that Congress intended the equal
access provision to be mandatory on the states.  <u>See</u> <u>Ark. Med.</u>
<u>Soc'y</u>, 6 F.3d at 526.

47

of law in holding that they are intended beneficiaries of the section.  Furthermore, we find that section 30(A) is sufficiently definite for the judiciary to enforce and that Congress intended to impose a binding obligation on states when it enacted the section.  As such, the recipient plaintiffs may maintain a suit under § 1983 to redress violations of the federal rights conferred upon them by section 30(A).[30]

## 2.   The Insufficiency of the Plaintiffs' Evidence

Concluding that recipients may bring a cause of action under § 1983 to redress violations of section 30(A) does not end our examination into whether the recipient plaintiffs have established a substantial likelihood of success in proving violations of section 30(A).  The question we must now consider is, in the case of these recipient plaintiffs, whether evidence exists in the record that supports a finding that after the reimbursement rate reduction, recipients will not have access to medical care equal to that of the non-Medicaid population in the

---

[30]   We agree with the district court that Congress did not foreclose a remedy under § 1983 for violations of section 30(A). As the Supreme Court held in Wilder, the administrative scheme underlying the Medicaid Act "cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983."  496 U.S. at 522.

same geographic area.[31]  See 42 U.S.C. § 1396a(a)(30)(A).  The district court held that Hood's primary reason for the rate reduction was budgetary and that "[t]here was no evidence of a determination of the impact the seven percent . . . reduction would have on providers."  Evergreen, 116 F. Supp. 2d at 752.  We conclude, however, that this was the wrong inquiry.

In order to succeed on a motion for preliminary injunctive relief, the plaintiffs must, "by a clear showing, carr[y] the burden of persuasion."  White v. Carlucci, 862 F.2d 1209, 1211 (5th Cir. 1989); see also Doe v. Duncanville Indep. Sch. Dist., 994 F.2d 160, 163 (5th Cir. 1993) ("To obtain a preliminary injunction, a movant has the burden of proving . . . a substantial likelihood of success on the merits[.]").  The plaintiffs have proffered affidavits and other documentary evidence attempting to demonstrate a negative impact to Medicaid recipients' equal access to care and services.  Most of the affidavits submitted were by providers, in which they asserted that should the 7% reimbursement rate reduction be implemented, they may be forced into bankruptcy and will be unable to continue to care for the recipients.  The evidence also offers predictions

---

[31]  We note that the statute in section 30(A) speaks in terms of "payments," rather than "rates."  While a reimbursement rate is a form of payment, there are other types of payment to providers, such as those to DSHs and, possibly, co-payments made by recipients.  These additional payments must also be taken into account in assessing whether the payments in the aggregate will be adequate.

49

that providers may be compelled to discharge some recipients or at least limit their access.

Regarding the actual impact on recipients, the record reveals evidence on only two of the recipient plaintiffs — Donna Methvien, mother of Victor Lee Methvien, Jr., and Farley Wayne Luttrell. Donna Methvien, in her "affidavit,"[32] attests that should the reimbursement rate reduction go into effect, there will be a severe "impact on [her] son's life and others at the community home in need of these special Medicaid funds." Furthermore, the record contains an affidavit by John Taylor, Vice President of Program Operations for Evergreen Presbyterian Ministries, Inc., in which he states that "[i]t is likely if the budget cuts are implemented that we will not be able to provide the services required or find an alternative treatment site for Mr. Luttrell and other severely disabled patients who therefore will lose access to needed medical care."

The plaintiffs argue further that "[s]tate institutions cannot absorb the number of residents if nursing facilities cannot continue to accept Medicaid recipients." However, aside from deposition testimony from Jerry Barnard that "predicts that Medicaid recipients may no longer be accepted by facilities if

---

[32] We note that several of these "affidavits" were not notarized or witnessed, and the district court recognized this deficiency at a motions hearing on March 27, 2000. Ms. Methvien's "affidavit" was deficient in this manner.

50

their costs are not covered," the plaintiffs point to no evidence to support this contention.

In our evaluation of the plaintiffs' evidence and of the district court's opinion, we find two problems with the district court's disposition of the evidence. First, the district court failed to address whether the access of individual Medicaid recipients will remain equal to that of the non-Medicaid population in the same geographic area after the proposed 7% rate reduction. Instead, as we stated above, the court found only that LDHH had failed to conduct studies[33] and failed to determine the impact of the rate reduction on providers. Thus, there were no findings on whether the plaintiffs carried their burden of demonstrating on the evidence that these individual recipients will be denied equal access to medical care.

Second, the plaintiffs failed to adduce evidence to support any such findings. In order for the recipient plaintiffs to establish a substantial likelihood on the merits, they must present evidence which demonstrates that if the 7% rate reduction is made effective, the recipients in a particular geographic area will not receive access to medical care equal to that of the non-

---

[33] The district court based its holding upon the fact that there was no evidence that LDHH conducted studies before implementing the rate reduction. While we do not reach the merits of this conclusion, we note that studies, while helpful, are not required by the language of section 30(A). Accord Methodist Hosps., Inc., 91 F.3d at 1030 ("Nothing in the language of [section 30(A)], or any implementing regulation, requires a state to conduct studies in advance of every modification.").

51

Medicaid population in that area.  Instead of producing such evidence, the plaintiffs put in evidence which predicted that the providers would experience financial distress.  While we agree that the evidence presented by the plaintiffs is certainly relevant, it provides us with no information on the actual impact on the comparability to the general population of the recipients' access to medical care.  Instead, it focuses solely on the impact on providers.

Moreover, there is no evidence from the plaintiffs that focuses on geographic areas and on the access to the different types of provider services available in those areas.  In order for courts to make a determination whether recipients are receiving equal access to health care, there must be evidence in the record regarding the relevant geographic area, the services offered in the area, and the recipient's relationship to that area.  As the Court of Appeals for the Seventh Circuit has recognized, the phrase "geographic area" may have several meanings, depending upon the type of access or the type of care. See Methodist Hosps., Inc., 91 F.3d at 1029.  However, there is no evidence in the record addressing this concern; there are only allegations of general state-wide access problems, which is not sufficient for the district court to determine whether a recipient's access will actually be affected.

Against the plaintiffs' failure to put on such evidence, Hood advances some evidence that would tend to suggest that, at

least in the case of nursing home facilities, there is an excess of available beds.  A March 17, 2000 nursing home census shows that there are many more certified beds[34] for Medicaid recipients than there are recipients to occupy them.  A February 19, 1999 letter from the Louisiana Nursing Home Association, one of the plaintiffs in this case, to Stephen Perry, the Governor's Chief of Staff, acknowledges this oversupply of beds in nursing facilities.  Castille testified in his deposition that this oversupply of beds led to a moratorium though the year 2005 on the issuance of new-facility need certificates, which are required to construct new nursing home facilities.[35]  The plaintiffs do not counter this evidence, and they had the burden of both production and persuasion in the first instance.

We conclude that because the district court and the plaintiffs' evidence focused almost exclusively on the impact of the reimbursement rate reduction on health care providers, the question whether recipients' access will be impaired was not

---

[34]  As Lisa Deaton, the Director of the Health Standards Section of LDHH, states in her affidavit, a bed must be "certified" in order to be occupied by a Medicaid recipient.

[35]  Moreover, Castille stated in his deposition that he had meetings with the program directors within LDHH's Medicaid program, in which he received "no indiction . . . from any of the program directors that there had been any exodus, large-scale or otherwise, of providers to the Medicaid program."  Hood directs our attention to the deposition testimony of Sally Thiel, a Program Director for the Mental Health Rehabilitation Program at LDHH, in which she states that there has been "a continuing increase in the number of providers who want to become [mental health rehabilitation] Medicaid providers."

properly addressed.  As we have stated, the focus of the
challenge must be on the <u>recipients</u>' access and how it compares
to the non-Medicaid population in the same geographic area.[36]  We
therefore find that there is an inadequate evidentiary base for a
conclusion by the district court that the plaintiffs have a
substantial likelihood of success in proving a violation of
recipients' right to equal access to medical care.  Because there
are no findings, and inadequate evidence had there been such
findings, we conclude that the district court abused its
discretion in holding that the plaintiffs had a substantial
likelihood of success in proving violations of section 30(A).[37]

---

[36]  In addition, the plaintiffs provide very little
information on the twenty-three recipients who are plaintiffs in
this case, and except for a few recipients, we are given no
indication of where these recipients reside in the state or of
the type of Medicaid services necessary for their care.
Therefore, we recognize that a court could abuse its discretion
in entering state-wide injunctive relief on such a meager showing
by the plaintiffs.

[37]  One of the unresolved issues is the appropriate standard
of review by which a district court is to evaluate the actions of
a state agency.  In <u>Wilder</u>, the Court recognized that a state's
"substantial discretion in choosing among reasonable methods of
calculating rates may affect the standard under which a court
reviews whether the rates comply with the [Boren Amendment]."
496 U.S. at 519.  The Court noted further that "the Courts of
Appeals generally agree that when the State has complied with the
procedural requirements imposed by the amendment and regulations,
a federal court employs a deferential standard of review to
evaluate whether the rates comply with the substantive
requirements of the amendment."  <u>Id.</u> at 520 n.18.  However, the
Court "express[ed] no opinion as to which of the cases contains
the correct articulation of the appropriate standard of review."
<u>Id.</u>
     We note that courts, including our own, have employed the
arbitrary and capricious standard in evaluating the actions of a

54

## IV. CONCLUSION

For the foregoing reasons, we VACATE the preliminary injunction,[38] VACATE the stay pending appeal, and REMAND to the district court for further proceedings consistent with this opinion.

state agency.  See Abbeville Gen. Hosp. v. Ramsey, 3 F.3d 797, 804 (5th Cir. 1993); Miss. Hosp. Ass'n v. Heckler, 701 F.2d 511, 516 (5th Cir. 1983); see also Ark. Med. Soc'y, 6 F.3d at 529; AMISUB (PSL), Inc. v. Colo. Dep't of Soc. Servs., 879 F.2d 789, 795-96 (10th Cir. 1989); Neb. Health Care Ass'n v. Dunning, 778 F.2d 1291, 1294 (8th Cir. 1985).
   The district court did not address the appropriate standard of review and appears to have used a de novo standard.  Using the standard employed by the district court, we have concluded that the court erred in its evaluation of the evidence.  We do not, however, mean to suggest that the de novo standard apparently used by the district court is the correct standard either for the district court or for this court.  A more deferential standard is more likely appropriate.

[38]  We recognize that plaintiffs have alleged several other statutory, constitutional, and state law violations.  In its opinion, the district court stated that these claims were "so intertwined" that "[s]hould plaintiffs be successful in their [sections 13(A) and 30(A)] claims, it is likely that some Constitutional and state law violations were also committed." Evergreen, 116 F. Supp. 2d at 754.  Because the district court found that the plaintiffs' success on the merits regarding their sections 13(A) and 30(A) claims was a predicate for their success on the remaining claims, these additional claims also fail as a basis for preliminary injunctive relief.

55