BECKER, Chief Judge,
dissenting, with whom Judges MANSMANN,* SCIRICA, McKEE and RENDELL join.
The focus of the majority opinion, quite properly, is on whether Section 30(A) is intended to benefit the provider plaintiffs. To reach the result that it was not, the majority must distinguish the case central to the outcome, Wilder v. Virginia Hospital Association, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), which held that the Boren Amendment, a statute that by its express terms required states to establish a scheme for reimbursement of Medicaid healthcare providers, is intended to benefit providers. The majority attempts to do so by reasoning that the Boren Amendment and Section 30(A) “eon-trast[ ] sharply.” Maj. Op. at 538. I disagree, for as I will explain, the two statutes confer nearly identical rights on providers. Hence this case is squarely controlled by Wilder, which compels the conclusion that healthcare providers may sue under § 1983 to enforce their rights under Section 30(A). The clear majority of Circuits to address the question whether healthcare providers may sue under S 1983 to enforce their rights under Section 30(A) have resolved that question in the affirmative, and my views are in accord.
As the majority observes, the Boren Amendment and Section 30(A) differ textually insofar as the Boren Amendment’s reference to provider costs in its definition of reimbursement rates is absent from Section 30(A). The rationale of Wilder, however, renders this difference immaterial, since Wilder nowhere relied on the Boren Amendment’s reference to provider costs in concluding that providers were intended beneficiaries of that statute. Rather, Wilder clearly explained that the reason providers were intended beneficiaries of the Boren Amendment is that the provision by its express terms required states to establish a scheme for provider reimbursement. See Wilder, 496 U.S. at 510, 110 S.Ct. 2510. Similarly, Section 30(A) expressly requires states to establish a system for reimbursing providers for services rendered.
Much of the majority opinion is devoted to explaining why Medicaid recipients are among the intended beneficiaries of Section 30(A). I agree, but a statute can have more than one class of intended beneficiaries and hence the mere fact that Congress intended Section 30(A) to benefit Medicaid recipients has no bearing on whether Congress also intended Section 30(A) to benefit Medicaid providers. By its own terms, Section 30(A) is addressed to both health *545 care providers and Medicaid recipients, for, like the Boren Amendment, it expressly requires states to establish a scheme for provider reimbursement and mandates minimum reimbursement rates defined by reference to quality of care and recipients’ access to care and services. Hence, Wilder controls.
While this brief introduction sets up the analytical core of this opinion, it is deficient to the extent that it lacks context— the dynamic of the real world of healthcare. Unfortunately, so does the majority opinion, which, while commendably terse, is short on “realpolitik.” I will therefore supply that broader context, which implicates the relationship between provider costs and the availability of services to Medicaid recipients. The background of this case is the recent change in the Medicaid system in the five-county Philadelphia metropolitan area from fee-for-serviee to managed care. The plaintiffs have adduced evidence designed to demonstrate that the HMOs, in administering Medicaid, have squeezed the pharmacies and reduced provider reimbursement rates to levels that, according to the plaintiffs, are below any reasonable measure of the cost of providing care and services. As a practical matter, if the HMOs set provider reimbursement rates too low, providers will simply refuse to render services to Medicaid recipients, and recipients will go without adequate access. In fact, 50% of the pharmacies that participated in Medicaid in the five county area have dropped out since 1997. The plaintiffs also produced evidence that no pharmacy within fifteen contiguous zip codes in Bucks and Montgomery counties participates in Medicaid, and that among those pharmacies in the five-county area that continue to participate in Medicaid, quality of care has suffered as a result of inadequate reimbursement rates.
While the plaintiffs’ submissions in this area are contested, and failure to establish that the challenged reimbursement rates violate Section 30(A)’s quality of care and adequate access mandates would be fatal to their case, they demonstrate a nexus between the interests of providers and the interests of recipients, which is recognized by the express terms of Section 30(A). Moreover, given the financial straits of Medicaid recipients and providers’ access to information on the relationship between reimbursement rates and provider participation in Medicaid, healthcare providers may be better able to enforce recipients’ and providers’ shared interest in assuring that provider reimbursement rates comply with the mandates of Section 30(A).
I thus respectfully dissent from the conclusion that § 1983 does not grant providers a cause of action to sue for violations of Section 30(A). Since the Court has not gone beyond the threshold issue of whether § 1983 grants providers a right of action to enforce Section 30(A), I would reconstitute the original panel so that it may resolve the merits of the Department’s summary judgment motion, which requires determining whether plaintiffs have produced sufficient evidence for a reasonable jury to find that the challenged reimbursement rates violate Section 30(A)’s quality of care and adequate access mandates, an issue on which I express no opinion.
I.
The managed care program at issue is HealthChoices, under which the Pennsylvania Department of Public Welfare has contracted with four HMOs to administer the Medicaid program in the five-county area. The Department agrees to pay the HMOs on a per-person basis, and permits the HMOs to set pharmacy reimbursement rates. The plaintiffs allege that the pharmacy reimbursement rates set by the *546 HMOs are below any reasonable estimate of pharmacies’ costs, and that unless rates are at least adequate to cover providers’ costs, they cannot be consistent with quality of care or sufficient to induce enough pharmacies to participate in Medicaid so that Medicaid recipients have the same access to pharmacies as members of the general population, as is required by Section 30(A).
In support of their claim that current rates are inconsistent with quality of care, the plaintiff pharmacists produced evidence that: (1) low reimbursement rates prevent them from dispensing or stocking certain drugs; (2) low reimbursement rates require them to cut back on services provided to customers, such as counseling customers about how to use their medication; (3) administrative problems with the HealthChoices HMOs prevent their customers from obtaining medication; (4) HealthChoices HMOs force their customers to change repeatedly their medication, causing delays and leading to health problems when the new medication is ineffective; (5) HealthChoices HMOs restrict the formularies that may be used to fill customer prescriptions, causing delays in customers’ prescriptions being filled, often to the detriment of customers’ health; and (6) HealthChoices HMOs make medical judgments on a daily basis over the phone and deny medications that they know nothing about.
In support of their allegation that the reimbursement rates fall below the minimum rates mandated by Section 30(A)’s access requirement, plaintiffs produced evidence showing a precipitous drop in the number of pharmacies in the five-county area who participate in Medicaid since the inception of HealthChoices. In particular, 50% of the pharmacies that participated in Medicaid have dropped out since 1997. Plaintiffs also produced evidence that the HealthChoices reimbursement rates are the lowest rates in the five-county area, and that whereas the Blue Cross network has 963 participating pharmacies in the five-county area, the four HealthChoices HMOs have only 600, 635, 794, and 864 pharmacies each participating in their networks. Moreover, there are no pharmacies that participate in Medicaid in fifteen contiguous zip codes in Bucks and Montgomery counties. Consequently, according to the plaintiffs, Medicaid recipients lack access to pharmacies to the same extent as the general population.
Whether this evidence is sufficient to create a triable issue of fact as to whether the current rates violate Section 30(A)’s quality of care and adequate access mandate is, of course, disputed by the Department. My purpose in summarizing this evidence is not to express a view as to whether this evidence is sufficient for plaintiffs’ claims to survive summary judgment, but rather to provide concrete evidence of the common interest shared by providers and recipients in enforcing the provider reimbursement rates mandated by Section 30(A).
On its face Section 30(A) is addressed to both healthcare providers and Medicaid recipients, as it expressly requires states to establish a scheme for provider reimbursement and mandates minimum reimbursement rates defined by reference to recipients’ quality of care and access to care and services. In particular, Section 30(A) requires states to “provide ... methods and procedures relating to ... the payment for[ ] care and services available under the plan” and to reimburse providers at rates that are “consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.”
*547 The House Report on the 1989 amendment to Section 30(A) confirms Congress’s recognition that because healthcare providers’ participation in Medicaid is voluntary, Medicaid recipients’ access to healthcare will suffer if provider reimbursement rates are too low to induce a sufficient number of providers to participate in Medicaid:
There is no doubt that Medicaid reimbursement rates have not kept pace with average community rates.... The Committee believes that, without adequate payment levels, it is simply unrealistic to expect physicians to participate in the program.... [T]he Committee bill would require that Medicaid payments for all practitioners be sufficient to enlist enough providers so that care and service are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.
H.R.Rep. No. 101-247, at 390 (1989), reprinted in 1989 U.S.C.C.A.N.2060, 2116. As the majority notes, Section 30(A)’s legislative history also indicates that Congress intended Section 30(A) to be enforced through private actions. See H.R.Rep. No. 158, at 312-13 (1981) (“[I]n instances where the States or the Secretary fail to observe these statutory requirements, the courts would be expected to take appropriate remedial action.”).
The evidence we have described illustrates the manner in which the interests of healthcare providers and Medicaid recipients are inextricably intertwined. As we noted in West Virginia, University Hospitals, Inc. v. Casey, 885 F.2d 11 (3d Cir.1989), aff'd on other grounds, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991):
We recognize, of course, that the primary purpose of medicaid is to achieve the praiseworthy social objective of granting health care coverage to those who cannot afford it. It does not necessarily follow, however, that Title XIX grants substantive rights only to medicaid patients. Although the broad purpose of the Medicaid Act as a whole is to help the poor attain medical care, the specific purpose of section 1396a(a)(13)(A) is to assure state compliance with some federal standard of hospital reimbursement. The section sets up a plan for the adequate and reasonable reimbursement of hospitals which serve medicaid patients, and thus hospitals are the section’s “beneficiaries.” Their interests and the interests of medicaid patients are bonded by a common goal, the delivery of adequate health care by the hospitals to state medicaid patients and the enjoyment of such care by the patients. The interests of both are intertwined and hospitals have a concrete stake in reimbursement in accordance with the federal statute and regulations.
Id. at 20. Against this backdrop, I now turn to the doctrinal question whether § 1983 grants healthcare providers a cause of action to enforce Section 30(A).
II.
Until now, nearly every Circuit to consider the issue has held that whether providers may bring actions under § 1983 to enforce the mandates of Section 30(A) is squarely controlled by the Supreme Court’s decision in Wilder, which of course remains binding on this Court unless the Supreme Court overrules it. See State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (“[I]t is this Court’s prerogative alone to overrule one of its precedents.”). The first Court of Appeals to consider the issue was the Eighth Circuit in Arkansas Medical Society, Inc. v. Reynolds, 6 F.3d 519 (8th Cir.1993), which concluded that Section 30(A) is indistinguishable from the Boren Amendment, which the Supreme Court in Wilder held was enforceable by providers under § 1983:
*548 Our analysis in this case is greatly simplified by the Wilder opinion. Although focusing on a different subsection, Wilder addressed the same statute facing us in this case. Suter urges a careful scrutiny of the exact legislation at issue and Wilder has already done that.... [T]he equal access provision is very analogous to the Boren Amendment examined in Wilder; they are similar not only in function but also in the specific language employed.
Id. at 525. With regard to the particular question whether providers are among the intended beneficiaries of Section 30(A), the Court determined that:
The question of whether the Medicaid providers are intended beneficiaries is also easily resolved. Wilder concluded that institutional providers were intended beneficiaries of the Boren Amendment because the Amendment concerned their reimbursement. Similarly, the equal access provision [of Section 30(A)] addresses payment for “care and services” provided by noninstitutional providers. The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries.
Id. at 526 (internal citations omitted).
The First Circuit and the Seventh Circuit have also easily resolved the issue whether providers may bring S 1983 actions to enforce Section 30(A) by noting that the question is squarely controlled by Wilder. In Visiting Nurse Association of North Shore, Inc. v. Bullen, 93 F.3d 997 (1st Cir.1996), the First Circuit concluded that providers are among the intended beneficiaries of Section 30(A) for the same reason that the Supreme Court held that they were among the intended beneficiaries of the Boren Amendment:
The Wilder Court first observed that the[Boren Amendment] “is phrased in terms benefitting health care providers,” and leaves “little doubt that health care providers are the intended beneficiaries,” then proceeded to illustrate how the plain language of the Boren Amendment “establishes a system for reimbursement of providers” .... As long as the two statutory provisions evince a congressional concern for preserving financial incentives to providers — by ensuring adequate reimbursement payment levels — providers are appropriately considered intended beneficiaries.
Id. at 1004 (emphasis and internal citations omitted). Similarly, the Seventh Circuit observed that because Wilder had not been overruled, “Wilder’s holding binds us,” and consequently held that providers have a private right of action under S 1983 to enforce Section 30(A). See Methodist Hosps., Inc. v. Sullivan, 91 F.3d 1026, 1029 (7th Cir.1996) (“We therefore ... hold that providers of medical care have a private right of action, derived through § 1983, to enforce § 1396a(a)(30).”). Thus, most courts have found that whether § 1983 grants providers a cause of action to enforce Section 30(A) is an issue that is easily disposed of by Wilder. Until now, the only Circuit to hold otherwise is the Fifth Circuit in Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908 (5th Cir.2000), which I discuss in Section IV, infra.
III.
A.
The majority holds that providers may not sue under § 1983'to enforce Section 30(A) because they are not among the provision’s intended beneficiaries.[1] Like *549 most Courts of Appeals to consider the issue, I believe that the inquiry into whether providers are among the intended beneficiaries of Section 30(A) begins and ends with Wilder.
The Boren Amendment, which was the statute that providers sought to enforce in Wilder, provided, in relevant part:
A State plan for medical assistance must ... provide ... for payment ... of hospital services, nursing facilities, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates ... which the State finds ... are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality....
42 U.S.C. § 1396a(a)(13)(A) (repealed).
The text of Section 30(A) is strikingly similar. It provides, in relevant part:
A State plan for medical assistance must ... provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers, so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area....
42 U.S.C. § 1396a(a)(30)(A). Comparing the two statutes, I can find no principled basis for holding that providers are intended beneficiaries of the Boren Amendment, as the Supreme Court held in Wilder, but are not intended beneficiaries of Section 30(A), as the majority holds today. In particular, I cannot accept the majority’s contention that “[t]he language of Section 30(A) contrasts sharply with that of the Boren Amendment.” Maj. Op. at 538 Both the Boren Amendment and Section 30(A) require states to reimburse providers for services rendered. See Boren Amendment (“A State plan for medical *550 assistance must ... provide ... for payment ... of ... services ... provided under the plan....”); Section 30(A) (“A State plan for medical assistance must ... provide ... methods and procedures relating to ... payment for, care and services available under the plan.... ”). And both the Boren Amendment and Section 30(A) define reimbursement rates by reference to efficiency and economy. See Boren Amendment (defining rates by reference to “efficiently and economically operated facilities”); Section 30(A) (requiring states “to assure that payments are consistent with efficiency [and] economy”).
Both the Boren Amendment and Section 30(A) require states to reimburse providers at rates that are sufficient to ensure quality of care. See Boren Amendment (requiring that reimbursement rates be “reasonable and adequate to meet the costs which must be incurred ... in order to provide care and services in conformity with ... quality and safety standards”); Section 30(A) (requiring states “to assure that payments are consistent with ... quality of care”). And both the Boren Amendment and Section 30(A) require states to reimburse providers at rates that are sufficient to guarantee Medicaid recipients adequate access to healthcare. See Boren Amendment (requiring “rates ... which ... are reasonable and adequate ... to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services”); Section 30(A) (requiring states “to assure that payments are ... sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area”).
Thus, far from “contrast[ing] sharply,” as the majority contends, see Maj. Op. at 538, the Boren Amendment and Section 30(A) confer on providers nearly identical rights to be reimbursed for services provided and to be reimbursed at a minimum rate that is defined by reference to quality of care and adequate access. See Ark. Med. Soc’y, Inc. v. Reynolds, 6 F.3d 519, 525 (8th Cir.1993) (“[T]he equal access provision [of Section 30(A) ] is very analogous to the Boren Amendment examined in Wilder, they are similar not only in function but also in the specific language employed.”). This case is therefore squarely controlled by Wilder, and I would hold that healthcare providers may bring § 1983 actions to enforce the rights conferred on them by Section 30(A).[2]
B.
The majority’s rationale relies heavily on the fact that Section 30(A) is addressed in part to recipients, since it defines provider reimbursement rates by reference to quality of care and adequate access. See Maj. Op. at 538 (“[Section 30(A)’s] directives to provide ‘quality of care’ and adequate access .... are drafted with an unmistakable focus on Medicaid beneficiaries, not providers.”); id. at 538 (“[Section 30(A)] demands that payments be set at levels *551 that are sufficient to meet recipients’ needs.”); id. (“[T]he adequacy of payments [under Section 30(A)] is measured in relation to the health needs of recipients.”); id. at 542 (“Section 30(A) focuses on the care and services available to recipients.”); id. at 538 (“It is therefore apparent from the statutory language that the intended beneficiaries of Section 30(A) are recipients, not providers.”).
To rely on the quality of care and adequate access guarantees as a basis for holding that Section 30(A) was not intended to benefit providers, however, would require overruling Wilder, which squarely held that a statute that defines provider reimbursement rates by reference to Medicaid recipients’ quality of care and Medicaid recipients’ access to care and services may nonetheless be intended to benefit providers. Nowhere in Wilder did either the majority or the dissent even hint that the Boren Amendment’s reference to quality of care and adequate access should give the Court pause before concluding that the Boren Amendment was intended to benefit providers. As such, for purposes of determining whether providers are intended beneficiaries of Section 30(A), Wilder renders irrelevant the fact that Section 30(A) includes quality of care and adequate access guarantees.
Inexplicably, then, the majority makes the adequate access and quality of care guarantees that are found in both the Boren Amendment and Section 30(A) the cornerstone of its analysis in holding that providers are not intended beneficiaries of Section 30(A). To be consistent with Wilder, which held that providers are intended beneficiaries of the Boren Amendment, however, a rationale leading to the conclusion that providers are not intended beneficiaries of Section 30(A) must rest not on similarities between the Boren Amendment and Section 30(A), as does the vast bulk of the majority opinion, but rather on differences.
C.
The only difference between the Boren Amendment and Section 30(A) that the majority- relies on is the Boren Amendment’s reference to providers’ costs, which is absent from Section 30(A). For the reasons discussed below, however, the reference to providers’ costs in the Boren Amendment and the absence of such a reference in Section 30(A) are immaterial for purposes of determining whether providers are among the intended beneficiaries of Section 30(A).
First, the language of the Boren Amendment did not create any independent right on the part of providers to be reimbursed for their costs without reference to quality of care, as the majority maintains. The majority repeatedly quotes the language in the Boren Amendment requiring payments to be “reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities,” Maj. Op. at 537, 538, but neglects to quote the remainder of the clause, which goes on to expressly define costs in terms of quality of care. In fact, the Boren Amendment required payment for “the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.” (emphases added). The plain language of the Boren Amendment thus explicitly defined “costs” by reference to quality of care, and created no independent right of providers to be reimbursed for their costs beyond that conferred by the quality of care requirement, such as exists in Section 30(A).
I acknowledge that quality of care guarantees in the two statutes are not completely identical- — -the Boren Amendment *552 requires rates that “meet the costs which must be incurred ... to provide care and services in conformity with ... quality and safety standards,” while Section 30(A) requires rates that “are consistent with ... quality of care.” I cannot agree with the majority’s conclusion, however, that this difference is so significant that quality of care “played a decidedly secondary role in the Boren Amendment,” but “is a primary benchmark” in Section 30(A). Maj. Op. at 539. Indeed, the majority never explains how a reimbursement rate could be so low that it violates the Boren Amendment’s requirement that rates meet “the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards,” yet nonetheless be “consistent with ... quality of care,” as mandated by Section 30(A).
Even assuming, arguendo, that the majority is correct that the Boren Amendment created an independent right on the part of providers to be reimbursed for their costs without reference to quality of care, the plaintiffs in Wilder were suing to enforce both their right to be reimbursed at rates that covered their costs, as well as their independent right under the Boren Amendment to be reimbursed at rates that are sufficient to ensure adequate access. See Wilder, 496 U.S. at 503, 110 S.Ct. 2510 (“Respondent contends that Virginia’s Plan for reimbursement violates the Act because the rates are not reasonable and adequate to meet the economically and efficiently incurred cost of providing care to Medicaid patients in hospitals and do not assure access to inpatient care.”) (emphasis added and internal quotation marks omitted). Had Wilder’s holding rested on the Boren Amendment’s reference to provider costs, as the majority contends, then the Court would have permitted the providers to sue under § 1983 to enforce only their right to be reimbursed for their costs, and not their additional right under the Boren Amendment to be reimbursed at rates sufficient to ensure recipients adequate access to care and services.
The plain language of § 1983 creates a cause of action not for a violation of a statute as an undifferentiated whole, but rather for a violation of a “right[ ] ... secured by the Constitution or laws” of the United States. See Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (“In order to seek redress through § 1983, ... a plaintiff must assert the violation of a federal right, not merely a violation of federal law.”); id. at 342, 117 S.Ct. 1353 (“It was incumbent upon the respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined ‘rights.’ ”). By permitting the providers’ suit to proceed, the Supreme Court necessarily held that providers are among the intended beneficiaries of not only the Boren Amendment’s requirement that reimbursement rates be sufficient to cover provider costs, but also the Boren Amendment’s requirement that reimbursement rates be sufficient to ensure recipients’ adequate access to care and services.
Finally, and most importantly, the Supreme Court’s rationale in Wilder made clear that in concluding that providers were intended beneficiaries of Section 30(A), it was relying not on the Boren Amendment’s reference to providers’ costs, as the majority asserts, but rather on the Boren Amendment’s express requirement that states establish a scheme to reimburse providers for services rendered. In attempting to distinguish Section 30(A) from the Boren Amendment, the majority repeatedly quotes Wilder’s conclusion that the Boren Amendment “was phrased in terms benefitting health care providers,” *553 see Maj. Op. at 537, 538, 543, but conspicuously omits the rest of the sentence, in which the Wilder Court explained why it concluded that the Boren Amendment “was phrased in terms benefitting health care providers.” The remainder of the sentence, which the majority never fully quotes, makes clear what particular statutory language in the Boren Amendment the Court in Wilder was in fact relying on in concluding that the Boren Amendment was “phrased in terms benefitting providers”:
There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms benefitting health care providers: It requires a state plan to provide for “payment of the hospital services, nursing facility services, and. services in an intermediate care facility for the mentally retarded provided under the plan.” 42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V)
Wilder, 496 U.S. at 510, 110 S.Ct. 2510 (internal alterations omitted) (emphasis added).
The majority is “convinced,” Maj. Op. at 538, that when the Wilder Court stated that the Boren Amendment “is phrased in terms benefitting health care providers: It requires a state plan to provide for ‘payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan,’ ” the Court was relying on language in the Boren Amendment other than the language it directly quoted. It is difficult to imagine how a judicial opinion could be more clear about what particular statutory language it is relying on to establish a given proposition than by expressly quoting that language immediately following the proposition, as the Supreme Court did in Wilder. The majority’s conclusion that the Court quoted only a portion of the statutory language that it relied on in concluding that the Boren Amendment was “phrased in terms benefitting health care providers” is particularly puzzling given that, according to the majority, that portion of the Boren Amendment that the Court actually quoted in the passage above was insufficient to establish the proposition for which it was cited, while that portion of the Boren Amendment that the Court neglected to quote (the Boren Amendment’s reference to provider costs) was, according to the majority, “plainly a boon for providers,” and “an unmistakable sign of a congressional desire to benefit providers.” Maj. Op. at 539.
Indeed, by the majority’s reasoning, it is hard to see why the Wilder majority, in concluding the Boren Amendment was “phrased in terms benefitting health care providers,” would even bother to quote the particular language in the Boren Amendment requiring “payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan,” given that, according to the majority, the nearly identical language in Section 30(A) requiring “payment for[ ] care and services available under the plan,” “manifests concern solely for the well-being of recipients.” Maj. Op. at 538 (emphasis added).[3]
*554 Given that the excerpt quoted above contains the Wilder Court’s entire discussion of whether providers were intended beneficiaries of the Boren Amendment, the majority is plainly incorrect when it asserts that “the Supreme Court [in Wilder] stressed the Boren Amendment’s cost-reimbursement language,” and that “the Court relied on language in the Boren Amendment that measured the adequacy of payments in relation to the economics of providers, i.e., their need to cover their reasonable costs.” Maj. Op. at 537 (emphases added). Nowhere in its analysis did the Court rely on the Boren Amendment’s reference to provider costs, much less “stress” such language, as the majority contends. And whatever this Court may think about the breadth of the Supreme Court’s rationale, it is not our function to rewrite a Supreme Court opinion to narrow its holding by imputing to the Court reliance on a fact that played no role in the Court’s rationale. Rather, the scope of the Wilder Court’s holding must be determined by reference to the Wilder Court’s ratio decidendi as articulated by the Wilder Court.
As is readily apparent from the analysis quoted above, the Wilder Court made perfectly clear that in concluding that “there can be little doubt that healthcare providers are the intended beneficiaries of the Boren Amendment,” it was relying on the language in the Boren Amendment requiring a state plan to provide for “payment of *555 the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.” See Ark. Med. Soc’y, Inc. v. Reynolds, 6 F.3d 519, 526 (8th Cir.1993) (“Wilder concluded that institutional providers were intended beneficiaries of the Boren Amendment because the Amendment concerned their reimbursement.”); see also Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908, 925 (5th Cir.2000) (“[T]he [Wilder] Court concluded that there was little doubt that the providers were the intended beneficiaries of the Boren Amendment because it established a system for reimbursement of providers and was phrased in terms bene-fitting health care providers, in that it required a state plan to provide for their payment.”) (internal quotations and alterations omitted); Visiting Nurse Ass’n of N. Shore, Inc. v. Bullen, 93 F.3d 997, 1004 (1st Cir.1996) (“The Wilder Court ... observed that the statute ‘is phrased in terms benefitting health care providers,’ and ... then proceeded to illustrate how the plain language of the Boren Amendment ‘establishes a system for reimbursement of providers.’ ”) (emphasis omitted).
Thus, for the same reason that the Wilder Court concluded that the Boren Amendment was “phrased in terms bene-fitting health care providers: It requires a state plan to provide for ‘payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan,’ ” 496 U.S. at 510, 110 S.Ct. 2510 (quoting the Boren Amendment), I would conclude that Section 30(A) is phrased in terms benefitting health care providers: It requires a state plan to provide for “payment for[ ] care and services available under the plan.” See Ark. Med. Soc’y, 6 F.3d at 526 (“[T]he equal access provision [of Section 30(A) ] addresses payment for ‘care and services’ provided by noninstitutional providers. The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries.”); Visiting Nurse Ass’n, 93 F.3d at 1004 (1st Cir.1996) (“As long as the two statutory provisions evince a congressional concern for preserving financial incentives to providers — by ensuring adequate reimbursement payment levels— providers are appropriately considered intended beneficiaries.”).[4]
*556 In sum, although there are differences between the specific language of the Boren Amendment and the specific language of Section 30(A), as there inevitably will be between any two statutes, these differences are immaterial in light of Wilder’s rationale, and the Supreme Court in Wilder gave no indication that its rationale was “good for this day and train only.” County of Washington v. Gunther, 452 U.S. 161, 183, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (Rehnquist, J., dissenting).
IV.
Until now, the only Court of Appeals to hold that providers may not bring § 1983 actions to enforce their rights under Section 30(A) was the Fifth Circuit in Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908 (5th Cir.2000), which I would decline to follow. In holding that providers are not among the intended beneficiaries of Section 30(A), the Fifth Circuit in Evergreen relied heavily on the Supreme Court’s decision in Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), which held that a plaintiff may sue under § 1983 for a violation of a federal statute only if the statute creates an individual entitlement, and not simply a systemwide guarantee. Id. at 343, 117 S.Ct. 1353. In Blessing, the plaintiffs were mothers whose children were eligible to receive child support services from the state pursuant to Title IVD of the Social Security Act. Id. at 332, 117 S.Ct. 1353. Plaintiffs brought a § 1983 action seeking to enforce 42 U.S.C. § 609, which authorizes the Secretary of the Department of Health and Human Services to penalize a state if it is not in “substantial compliance” with Title IV-D. Id. at 335,117 S.Ct. 1353.
The Blessing Court held that § 609(a)(8) does not create an individual right, enforceable under § 1983, to have states achieve substantial compliance with Title IV-D. First, the Court noted that the plaintiffs had failed to identify a particular provision of Title IV-D that grants them an individual entitlement, and may not simply sue to enforce substantial compliance with Title IV-D as a whole. See Blessing, 520 U.S. at 342, 117 S.Ct. 1353 (“It was incumbent upon respondents to *557 identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined ‘rights.’ ”). Second, the Court reasoned that because § 609(a)(8)’s “substantial compliance” requirement would be satisfied if the state provided the mandated services in only 75% of the cases reviewed during the federal audit period, “even when a State is in ‘substantial compliance’ with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet.” Id. at 844, 117 S.Ct. 1353. Thus, “[f]ar from creating an individual entitlement to services, the standard [which plaintiffs seek to enforce under § 1983] is simply a yardstick for the Secretary to measure the systemwide performance of a State’s Title IV-D program.” Id. at 343, 117 S.Ct. 1353.
In view of the Supreme Court’s rationale in Blessing, plaintiffs’ claims in this case are easily distinguishable from plaintiffs’ claims in Blessing. First, unlike the plaintiffs in Blessing, the plaintiffs in this case have identified with particularity the right claimed, since they allege that the reimbursement rates violate Section 30(A)’s quality of care and adequate access mandates. Cf. Blessing, 520 U.S. at 342, 117 S.Ct. 1353 (distinguishing Wilder on the ground that “in Wilder, we held that health care providers had an enforceable right to reimbursement ... as required by a particular provision in the Medicaid statute”) (emphasis added). This case is therefore distinguishable from Blessing for the same reason that the Blessing Court concluded that Wilder was distinguishable from Blessing.
Blessing is further distinguishable on the ground that in that case, the plaintiffs would not necessarily have obtained any benefit had they succeeded on the merits of their claim, since the provision that they sought to enforce under § 1983 required only “substantial compliance” with Title IV-D. See Blessing, 520 U.S. at 344, 117 S.Ct. 1353 (“[E]ven when a State is in ‘substantial compliance’ with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet.”). By contrast, in this case each individual plaintiff will necessarily benefit if they succeed on the merits, since they would each be individually entitled to reimbursement at higher rates.
I therefore disagree with Evergreen’s reliance on Blessing in concluding that Section 30(A) creates only a system-wide guarantee, not an individual entitlement on the part of providers. The Fifth Circuit in Evergreen illustrated its reasoning with the following example:
Assume we have a nursing home in Baton Rouge with 150 residents, which, following the [rate reduction at issue], is forced into bankruptcy and then liquidation. Assume further that the district court decides that the relevant geographic market to measure the access of recipients is the Baton Rouge market for nursing home care and also that the district court concludes that the recipients are entitled to the same access to nursing home care in Baton Rouge as that of non-Medicaid recipients. Finally, assume that, once the nursing home closes, all 150 residents are able to fill vacant beds in other facilities in Baton Rouge. Under this scenario, there is no violation of the recipients’ equal access rights, despite the fact that the bankrupt nursing home was put out of business.
From this example, it is apparent that while recipients have an individual entitlement to equal access to medical care, any benefit to healthcare providers is indirect at best. The statute does not *558 confer any direct right upon the individual provider because, as the above example illustrates, even if an individual provider is forced to liquidate, the recipients’ right to access is not necessarily violated.
235 F.3d at 929. I find this reasoning unpersuasive.
First, the Fifth Circuit put the rabbit in the hat when it reasoned from a hypothetical example in which Section 30(A) is not violated. See Evergreen, 235 F.3d at 929 (“Under this scenario, there is no violation of the recipients’ equal access rights....”). Of course providers will have no individual entitlement under Section 30(A) to increased reimbursement rates under a factual scenario in which Section 30(A) is not violated. But in a factual scenario where reimbursement rates are so low that Section 30(A)’s adequate access guarantee is violated, every provider who participates in Medicaid would be individually entitled to reimbursement at the higher rate mandated by Section 30(A).
Second, Evergreen incorrectly assumed that unless a statute requiring providers to be reimbursed at a given rate ensures that no providers will ever be put out of business, the statute does not create any direct right on the part of providers. See Evergreen, 235 F.3d at 929 (“The statute does not confer any direct right upon the individual provider because, as the above example illustrates, even if an individual provider is forced to liquidate, the recipients’ right to access is not necessarily violated.”). Under any statute addressed to provider reimbursement, however, it will almost always be the case that some providers may go out of business notwithstanding the statute. But this possibility does not mean that the statute creates no individual entitlement on the part of providers.
Consider, for example, a statute that expressly requires states to reimburse pharmacies at least $25 each time they dispense a given dosage of a particular prescription drug to a Medicaid recipient. A $25 reimbursement rate might force certain providers out of business, but it is hard to imagine a statute that more directly confers an individual entitlement on providers. Similarly, there was no guarantee in the Boren Amendment that no provider would ever be put out of business, but the Court in Wilder nonetheless held that the Boren Amendment conferred on providers rights that are enforceable under § 1983.
Finally, the Evergreen Court mistakenly reasoned that because the minimum reimbursement rate mandated by Section 30(A) is defined by reference to the market-wide criterion of Medicaid recipients’ access to healthcare, it does not confer an individual entitlement on providers. See Evergreen, 235 F.3d at 928 (“Section 30(A) does not create an individual entitlement in favor of any provider. The section benefits recipients by ensuring there is an adequate number of providers in the market place.”). That Section 30(A) defines the mandatory minimum provider reimbursement rate by reference to the number of providers in the market place, however, does not make the rate any less mandatory or any less of a minimum. As long as a statute expressly requires providers to be reimbursed at rates that are at least equal to a defined minimum, then the statute creates an individual entitlement on the part of every provider to be reimbursed at that minimum, regardless whether the minimum is defined by reference to providers’ costs, recipients’ access, quality of care, market rates, or a fixed sum.
Thus, contrary to the Fifth Circuit’s conclusion that “it cannot be said that section 30(A) necessarily confers upon each provider an individual right to a particular payment,” Section 30(A) clearly does confer upon each provider an individual right *559 to be paid at rates that are at least equal to the statutory minimum. See Wilder, 496 U.S. at 510,110 S.Ct. 2510 (“There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms benefítting health care providers: It requires a state plan to provide for ‘payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.’ ”) (internal alterations omitted). Cf. W. Va. Univ. Hosps., Inc. v. Casey, 885 F.2d 11, 21 (3d Cir.1989), aff'd on other grounds, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (“Who else is more aggrieved by the absence of an adequate or reasonable hospital reimbursement rate than a disadvantaged hospital and who has a more compelling interest to press for a correction?”).
V.
Finally, although one can find isolated instances of Medicaid recipients suing to enforce Section 30(A), see, e.g., Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908, 931-32 (5th Cir.2000); Ark. Med. Soc’y, Inc. v. Reynolds, 6 F.3d 519, 522 (8th Cir.1993), I do not share the majority’s optimism that lawsuits brought by Medicaid recipients will provide sufficient private enforcement. See Maj. Op. at 544 (“If, as the plaintiffs in this case allege, the rates set under the HealthChoices program are so low that compliance with the ‘quality of care’ and access requirements is threatened, we see no reason to believe that recipients in the affected area of the Commonwealth will not seek legal redress to ensure that these critical mandates are met.”). Medicaid recipients are, by definition, people facing severe financial hardship, and therefore are unlikely to have the same access to legal services as healthcare providers.[5]
Moreover, Section 30(A), by its express terms, uses provider reimbursement rates as the means of ensuring recipients’ quality of care and adequate access, and healthcare providers are more likely than Medicaid recipients to possess information about the relationship between current provider reimbursement rates and recipients’ quality of care and access to care and services. Indeed, few if any Medicaid recipients will even be aware of current provider reimbursement rates, much less have an idea of how a particular rate compares with provider costs and the reimbursement rates offered by non-Medicaid healthcare plans. Nor are Medicaid recipients likely to have ready access to statistical information on the extent to which healthcare is available to the general public, for purposes of determining whether current reimbursement rates comply with Section 30(A)’s adequate access mandate. By contrast, professional associations such as the pharmacists association plaintiff in this case are more likely to possess the market data necessary to determine whether a colorable claim under Section 30(A) exists.
*560 In sum, because Section 30(A) is expressly addressed to the financial incentives of healthcare providers to participate in Medicaid, healthcare providers are well-situated to vindicate recipients’ and providers’ shared interest in ensuring that provider reimbursement rates are consistent with quality of care and sufficient to guarantee Medicaid recipients access to care and services to the same extent as the general public. These practical considerations further support the result compelled by Wilder.
VI.
Because I believe that the question whether providers may bring § 1983 actions to enforce Section 30(A) is squarely controlled by Wilder, I would decline to follow Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908 (5th Cir.2000), and would join those Circuits that, relying on Wilder, have permitted providers to bring such claims. See Visiting Nurse Ass’n of N. Shore, Inc. v. Bullen, 93 F.3d 997, 1005 (1st Cir.1996) (“[W]e conclude that plaintiffs possess standing ... to enforce section 1396a(a)(30)....”); Methodist Hosps., Inc. v. Sullivan, 91 F.3d 1026, 1029 (7th Cir.1996) (“We therefore ... hold that providers of medical care have a private right of action, derived through § 1983, to enforce § 1396a(a)(30).”); Ark. Med. Soc’y, Inc. v. Reynolds, 6 F.3d 519, 528 (8th Cir.1993) (“[T]he equal access provision [of Section 30(A)] may be enforced by Medicaid recipients and providers using 42 U.S.C. § 1983.”). I thus respectfully dissent.
To hold as have these other Courts would not of course be the end of the case, for the plaintiffs would still have significant hurdles in the next phase. In particular, plaintiffs would have to demonstrate that they have produced sufficient evidence for a reasonable jury to find that the current reimbursement rates are so low that they violate either the quality of care or adequate access mandate contained in Section 30(A), a question on which I express no opinion here. Since the Court has not gone beyond the threshold issue of whether § 1983 grants providers a right of action to enforce Section 30(A), I would reconstitute the original panel so that it may resolve the merits of the Department’s summary judgment motion, which requires determining whether plaintiffs have produced sufficient evidence for a reasonable jury to find that the challenged reimbursement rates violate Section 30(A)’s quality of care and adequate access mandates.

 The Honorable Carol Los Mansmann participated in the oral argument and joined in this opinion, but died before the opinion could be filed.

. I disagree with the majority's replacement of the requirement under § 1983 that "Congress must have intended that the provision in question benefit the plaintiff," Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353, *549 137 L.Ed.2d 569 (1997), with the stricter requirement, drawn from an implied right of action case, that the statute must be "draft[ed] ... with an unmistakable focus on the benefitted class.” Cannon v. Univ. of Chi., 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). See Maj. Op. at 536, 538. The Supreme Court has made clear that:
[Whether a cause of action exists under § 1983] is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute. In implied right of action cases, we employ the four-factor Cort test to determine whether Congress intended to create the private remedy asserted for the violation of statutory rights. The test reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for. violations of statutes. Because § 1983 provides an alternative source of express congressional authorization of private suits, these separation-of-powers concerns are not present in a § 1983 case.
Wilder, 496 U.S. at 508 n. 9, 110 S.Ct. 2510 (internal quotations and citations omitted). The Supreme Court has never held that to be enforceable under § 1983, a provision must also be “draft[ed] ... with an unmistakable focus on the benefitted class," Cannon, 441 U.S. at 692, 99 S.Ct. 1946, as the majority asserts. Rather, in the § 1983 context, a plaintiff must simply show that the provision in question was "intended to benefit” the plaintiff. Golden State Transit Corp. v. City of L.A., 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989).

. I fully concur in the majority’s distinction between "the question whether a statute is intended to benefit particular plaintiffs” and "the question whether the statute in fact benefits those plaintiffs.” Maj. Op. at 536. Similarly, I agree with the majority's observation that "lessors of pharmacy premises, cleaning service firms retained by pharmacies, trash collection companies retained by pharmacies, [and] private security firms retained by pharmacies” may all benefit from Section 30(A). Maj. Op. at 536. But I have little difficulty in concluding that these third parties are not among the intended beneficiaries of Section 30(A), for tlie simple reason that Section 30(A) expressly requires states to establish a scheme for reimbursing those who provide healthcare services, not garbage collection services or security services. *556 See Maj. Op. at 538 (observing that under Section 30(A), "the adequacy of payments is measured in relation to the health needs of recipients”). But if the majority's test of whether providers are intended beneficiaries of a statute requiring states to pay providers is whether the statute’s language expressly defines reimbursement rates solely by reference to the health needs of recipients, then that test too, produces unreasonable results. Under such a test, providers would not be among the intended beneficiaries of a statute whose language expressly required states to pay providers ten times the rate needed to ensure Medicaid recipients quality of care and adequate access, but providers would be intended beneficiaries of a statute whose language expressly required states to pay providers a dollar every time they filled a Medicaid prescription.
Finally, it may be that the minimum reimbursement rates actually mandated by the Boren Amendment were lower than the actual minimum rates mandated by Section 30(A). For example, the Boren Amendment’s access requirement mandated that rates be sufficient to ensure only that "individuals eligible for medical assistance have reasonable access,” whereas Section 30(A) requires equal access — rates must be “sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.” Fortunately, Wilder avoided the problem of distinguishing those mandatory payment floors that are intended to benefit the payee from those that are not. While how high the statute sets the payment floor will determine the magnitude of the intended benefit (a low minimum reimbursement rate obviously does not benefit providers as much as a high minimum reimbursement rate), under Wilder as long as the statute expressly requires states to pay providers, providers are intended beneficiaries.

. The majority attempts to overcome the obvious difficulty posed by the Wilder Court’s quotation of the particular language in the Boren Amendment that it was relying on by invoking the canon of construction that a statute should be construed to avoid rendering any part of it superfluous. According to the majority, if the reason that Wilder concluded that the Boren Amendment was "phrased in terms benefitting health care providers” was that it required a state plan to provide for "payment of the hospital services, nursing facility ser *554 vices, and services in an intermediate care facility for the mentally retarded provided under the plan” (the language in the Boren Amendment that the Wilder majority relied on), then the' Supreme Court’s "full [sic] sentence (‘The provision establishes a system for reimbursement of providers and is phrased in terms benefitting health care providers’) would say exactly the same thing twice....” Maj. Op. at 538.
I believe that this reasoning errs by "minutely parsing phrases, and seeking shades of meaning in the interstices of sentences and words, as though a discursive judicial opinion were a statute.” Schlup v. Delo, 513 U.S. 298, 343, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (Scalia, J., dissenting). Even if the majority were correct that my reading of Wilder renders a portion of a sentence in the opinion redundant, it would be neither the first nor the last time that a judicial opinion sought clarity at risk of redundancy. Whatever redundancy might exist in the sentence at issue in Wilder, I nonetheless believe that the Court was relying on the statutory language that it quoted when it stated that the Boren Amendment "is phrased in terms benefitting health care providers: It requires a state plan to provide for ‘payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.’ ”
At all events, the Supreme Court's statement that the Boren Amendment "establishes a system for reimbursement of providers” and the Supreme Court's conclusion that the Boren Amendment "is phrased in terms benefit-ting health care providers” because it "requires a state plan to provide for 'payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan’ " do not amount to "say[ing] exactly the same thing twice.” Maj. Op. at 538. The first statement is addressed to the substance of the Boren Amendment (the Boren Amendment "establishes a system for reimbursement of providers,” 496 U.S. at 510, 110 S.Ct. 2510); the second statement is addressed to the Boren Amendment’s text (the Boren Amendment "is phrased in terms benefitting health care providers”):
It requires a state plan to provide for 'payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.’ 496 U.S. at 510, 110 S.Ct. 2510. See Maj. Op. at 536 (commenting on "the importance of the particular phrasing of a statute in this regard”); Maj. Op. at 540 ("[T]he inquiiy mandated by Wilder and Blessing — whether Congress intended for Section 30(A) to benefit providers as opposed to simply knowing that providers would be benefited — calls for us ... to take into account the precise statutory language adopted by Congress.”).

. One further point needs to be made-that the majority’s departure from Wilder creates serious line-drawing problems. Whereas Wilder held that any statute that expressly requires states to pay providers is intended to benefit providers, the majority holds that whether such a statute is intended to benefit providers depends on how the statute defines the minimum payment rate. But the majority never offers an analytically sound explanation of how we are to distinguish those payment floors that are intended to benefit providers from those payment floors that are not.
At times, the majority appears to rely on the fact that the payment floor mandated by Section 30(A) is not expressly defined by reference to provider costs or provider economics. See Maj. Op. 538 (distinguishing Wilder on the ground that the Boren Amendment “measured the sufficiency of payments by reference to the economics of providers”); Id. at 538 ("Unlike the Boren Amendment, [Section 30(A) ] evinces no direct concern for the economic situation of providers.”). But if the majority's test of whether providers are intended beneficiaries of a statute requiring states to pay providers some minimum amount turns on whether the language of the statute expressly defines the minimum reimbursement rate by reference to provider costs or provider economics, then providers would not be among the intended beneficiaries of a statute that required states to pay pharmacies $2,500 each time they dispense a given dosage of a particular prescription drug, but would be among the intended beneficiaries of a statute that required states to pay providers 1% of their costs each time they dispensed a drug. In my view, this taxonomy is unreasonable.
Elsewhere, the majority appears to rely on the fact that the text of Section 30(A) defines the minimum reimbursement rates solely by reference to the health needs of recipients.

. To be sure, attorney’s fees are available to a successful § 1983 plaintiff. See 42 U.S.C. § 1988 ("In any action or proceeding to enforce a provision of section[ ] ... 1983 ... of this title, ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs....”). Awards of attorney’s fees may be inadequate to induce attorneys to represent Medicaid recipients in Section 30(A) cases, however, since such attorneys would assume the risk of earning no fees if the lawsuit is unsuccessful. See City of Burlington v. Dague, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (holding that in determining the reasonableness of attorney’s fees under federal fee shifting statutes, courts may not enhance the fee award above the "lodestar” amount to compensate attorneys for assuming the risk of receiving no payment for their services if the lawsuit failed).